A. W. MELLON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.[1]

Docket No. 76499.   Promulgated December 7, 1937.

---

[1] This proceeding was heard before a special Division of the Board consisting of Van Fossan, presiding, Trammell, and Turner. Trammell resigned from the Board after completion of the testimony but before the final submission of the case. By direction of the Board the opinion is written in part by Van Fossan and in part by Turner.

*Frank J. Hogan, Esq., William A. Seifert, Esq., Maynard Teall, Esq., Paul G. Rodewald, Esq., W. W. Booth, Esq., Nelson T. Hartson, Esq., Donald D. Shepard, Esq.,* and *A. G. Wallerstedt, Esq.,* for the petitioner.

*Robert H. Jackson, Esq., F. R. Shearer, Esq., David R. Shelton, Esq.,* and *E. L. Updike, Esq.,* for the respondent.

984

990

992

993

1004

1010

1012

1018

1044

OPINION.

## I.—*The Stock Sales.*

VAN FOSSAN: The stock transactions described in part I of our findings of fact—specifically, the sale by petitioner of stock of Pittsburgh Coal Co. to the Union Trust Co., the sale by R. B. Mellon on petitioner's behalf of stock of the Western Public Service Corporation to the Union Trust Co., and the sale by petitioner of stock of five corporations to the Ascalot Co., are the only stock sales under question in this proceeding. The sale of Pittsburgh Coal Co. stock and the sale of stock of the Western Public Service Corporation are the only items against which the charge of fraud is now specifically made.

Though our finding of fact that the sale of the Pittsburgh Coal Co. common stock was a completed and bona fide sale disposes of the issue, we will advert to some of the arguments relied on by respondent to support his disallowance and to sustain his charge of fraud.

Respondent contends that this sale of stock was invalid because inspired by a tax-saving motive. The sale was frankly admitted to have been made to establish the amount of loss in value of the stock and with the further purpose of claiming a deduction of such amount in petitioner's tax return. The law on this question is clear. "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose a pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Gregory* v. *Helvering*, 69 Fed. (2d) 809. In the same case in the Supreme Court, the Court, speaking through Mr. Justice Sutherland, said: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits, can not be doubted." *Gregory* v. *Helvering*, 293 U. S. 465. The same law that requires the reporting of profits for taxation grants the tax-payer the right to deduct certain losses actually incurred. So far as the tax-saving motive was concerned, petitioner had full sanction of the law.

Respondent points to the "casual manner" in which the sale was made. The word "casual" when so used is a relative term. It depends on the familiarity of the principals with matters of similar import. That which would cause the man of limited experience to ponder and hesitate long before consummation might well seem to be handled most casually by the man of large affairs. Both parties to this sale were men of wide business experience, well informed as to the subject matter and possessed of all the information necessary to enable them to make up their minds. Each knew the other was capable of carrying out his bargain. If they desired, the one to sell, the other to buy, there was no occasion for further consideration or delay.

Respondent further contends that a genuine sale by petitioner of his Pittsburgh Coal Co. stock is inconceivable because of the strategic importance in petitioner's portfolio of investments of the ownership of such stock. He points to the later sale of the stock by the Union Trust Co. to the Coalesced Co. and argues that the two transactions were but parts of a plan conceived by petitioner for retaining control of the stock while obtaining a deduction from his taxes. The answer to the first phase of this contention is that the evidence clearly establishes that petitioner did sell all of his Pittsburgh Coal common stock and has never reacquired the same or similar property.

The answer to the second phase of respondent's argument is that the Coalesced Co. was a wholly separate corporate entity, entitled to buy and sell at its election. Petitioner had parted with all voting interest in the Coalesced Co. when he made a gift of all of the common stock to his children. Respondent contends that Coalesced was a "family corporation" controlled by petitioner. Although it was a "family corporation" in that the owners of the common stock were, respectively, the son and the daughter of petitioner, while petitioner owned the preferred stock, petitioner did not control or dictate the policy of Coalesced. On parting with the common stock he severed all active relationship with the company. The corporation was thereafter controlled by its new common stockholders. The record clearly establishes that petitioner had no knowledge of the purchase by Coalesced of the stock of the Pittsburgh Coal Co. until some months after it occurred.

But even were the control referred to by respondent proven to exist, the legal conclusion which he would have us draw, that the sale was invalid, would not follow. The separate legal entity of a corporation is not thus lightly put aside. *Commonwealth Improvement Co.* v. *Burnet*, 287 U. S. 415; *Jones* v. *Helvering*, 71 Fed. (2d) 214; *Edward Securities Corporation*, 30 B. T. A. 918; affd., 83 Fed. (2d) 1007; *A. S. Eldridge*, 30 B. T. A. 1322; affd., 79 Fed. (2d) 629. Previous to the Revenue Act of 1934 the validity, for tax purposes, of a sale between persons, otherwise legally qualified, in no wise depended on the consanguinity of the participants. Assuming an ability on the part of each to fulfill his commitments, a man might deal as freely with his brother, his son, his daughter, or with a corporation in which he or they were interested, as with a stranger. It was only when fraud or other exceptional circumstance was proven to exist that the law refused full recognition to their transactions. Here there was neither fraud nor exceptional circumstance to create an exception to the rule. The subsequent acquisition of the stock by Coalesced in no way colored or affected the validity of the prior sale by petitioner.

Respondent also advances the argument that the Union Trust Co. was merely an accommodation holder for the benefit of petitioner and, since Coalesced did not acquire the stock until April 25, 1932, the sale did not actually occur in the taxable year 1931.

The record furnishes a complete answer to this argument. Petitioner sold the stock to the Union Trust Co. without reservation or restriction on December 30, 1931. The Trust Co. paid petitioner the current market price. Petitioner never reacquired the stock. This transaction was an absolute and legal sale. It was in no way dependent on or affected by the subsequent acquisition by Coalesced. The record establishes that the sale by the Trust Co. four months later was

an entirely separate and distinct transaction, conducted without the knowledge or concurrence of petitioner, based on its own adequate considerations. The inference that the Trust Co. was, in this case, merely an accommodation holder is squarely met and answered by the evidence.

Respondent alleges in his answer, and in argument lays great stress on the charge, that petitioner's gifts of property to his children, the sales of stock to corporations owned by them, and the sales of stock to other corporations which later sold to corporations owned by the children were but part and parcel of a plan conceived by petitioner for distributing his wealth to his children in order to defeat possible gift, estate, and inheritance taxes.

Respondent's argument is apparently based on the assumption that if such motive existed it would invalidate the transfers. Here he falls into error. The only effect of a gift tax, albeit in 1931 there was no Federal law imposing such a tax, is to require the payment of a tax on the transfer. It presupposes a completed gift. Likewise, the estate tax law does not invalidate transfers made in contemplation of death. It merely provides for the inclusion in the taxable estate of property so transferred, regardless of the transfer of ownership. Here, moreover, all of the sales in question were at market and, thus, being made for an adequate and full consideration in money or money's worth, are expressly without the scope of the estate tax provisions. In the instant case we are concerned solely with the taxation of income. Were respondent to establish by proof the truth of his allegation, we are unable to perceive any legal consequence of advantage to the Government that would follow in this proceeding.

Not only is there no evidence in support of the allegation that petitioner's gifts and sales were thus motivated, there is, on the contrary, a normal and rational explanation of petitioner's procedure. His gifts were both an evidence and a consequence of the nearness of the relationship between petitioner and his children. This thread of paternal interest appears persistently throughout the record in this case. It is a key which unlocks many otherwise unrevealed chambers of the petitioner's mind and provides effective refutation of the inferences respondent would have us draw from petitioner's conduct.

Moreover, petitioner's action was based on long established family precedent. When petitioner was young in the field of business his father had made him a gift of a part ownership, and later of entire ownership, of the bank which was the cornerstone in his subsequently successful business career. This expression of confidence was pursuant to a plan, adopted and followed to its conclusion by the father, of distributing all of his property to his children during his lifetime. When petitioner's brother, R. B. Mellon, returned from the West, peti-

tioner gave him a half interest in the bank, thereby beginning a long business association which had been both happy and profitable. Thus, when his own children approached maturity, petitioner determined to follow the precedent, well proven in his own experience, and confer on them, at once, responsibility and opportunity. He initiated a policy of making gifts of securities and other property to them. Convinced of the wisdom of his policy and satisfied with the judgment thus far shown by them in handling substantial affairs, and further motivated by a desire to be relieved of part of the responsibility of active supervision and management of his many business interests, petitioner, in the taxable year, made large gifts of securities to his children.

There was nothing unique in the fact that petitioner determined to school his children in the handling of wealth while he was yet alive or that his interest in them went so far as to provide them with the material means whereby, during his lifetime, they might assume among their fellows a position of influence and leadership. Likewise, there is nothing unusual in his desire to be rid of part of the responsibility consequent on the possession of great wealth.

Further, dealing with the same matter, respondent calls to attention the fact that petitioner and his brother, R. B. Mellon, pursued almost identical courses in bestowing property on their children and argues that this evidences a joint intention to defeat taxes. What has been said above is equally pertinent here. It may be said in passing, however, that the fact that two men, brothers in blood, intimate business associates, endowed with the same family tradition, may have followed the same procedure is not difficult to understand. Nor is any unfavorable inference to be drawn from that fact. The test is the motive behind the parallelism of conduct. Concert of action, as such, is not condemned by the law. It is only when concert of action results from improper motives that the word "conspiracy" is to be applied. Here the evidence does not establish an improper motive.

The sale by petitioner of Pittsburgh Coal Co. stock is clearly demonstrated to have been bona fide and legal in all aspects.

Respondent alleges that, in the event the sale of Pittsburgh Coal Co. stock be held valid, the basis for determining loss on part of the stock so sold was the value of that stock on December 30, 1931, when it was transferred from the Joint Account to petitioner's personal account. This allegation rests entirely on his other allegation that the Joint Account was a partnership. In his brief respondent attaches no importance to this contention and relies entirely on his efforts to prove the sale fraudulent. The finding of fact that the relationship between A. W. and R. B. Mellon, evidenced by the Joint

Account, was not a partnership carries with it, of necessity, the denial of respondent's contention. This conclusion is fully supported by the evidence and the applicable law.

In the sale of stock of the Western Public Service Corporation a different question is presented. Petitioner contends that the record reveals a complete bona fide sale to the Union Trust Co. and an independent acquisition of the same amount of the same stock 37 days later. He contends that such transactions were made in good faith and that no contract or option to reacquire was entered into within 30 days of the original sale.

Respondent contends that no valid sale was made; that the transaction was a mere accommodation sale; subject to an understanding or agreement that the same shares would be retransferred to the original owner after the expiration of the statutory period; that petitioner has not sustained his burden of proof. He contends further that the sale was fraudulent.

The respondent disallowed the claimed loss on the ground that the disposal does not appear to have occurred in "transactions on which losses may be recognized for income tax purposes." This language was all-comprehensive. It cast on the petitioner the burden of proving all the elements and facts necessary to justify a deduction. Under such circumstances the petitioner must prove not only that a sale had been made, but that no contract or option to reacquire had been entered into within 30 days of the sale. *Rand* v. *Helvering*, 77 Fed. (2d) 450. Moreover, in his petition taxpayer recognized this burden and alleged that no contract or option to reacquire had been entered into within the statutory period of 30 days. This fact he failed to prove. Both parties to these transactions are dead and the testimony before us is, therefore, not as complete as it might otherwise have been. Though the paucity of proof may be due to causes beyond the control of petitioner, this fact does not relieve petitioner of his burden. The record does not reveal specifically when R. B. Mellon and H. C. McEldowney agreed to the reacquisition. On the evidence before us, we are unable to hold that petitioner has sustained the burden of proving that he suffered a deductible loss in the transactions in stock of the Western Public Service Corporation. The alleged loss is accordingly disallowed.

The third item of stock sales disallowed by respondent was the sale by petitioner of stock in five corporations to the Ascalot Co.

In his answer respondent alleged that these sales were fraudulent, but on brief and argument he abandoned this charge and rested on the proposition that they did not give rise to deductible losses because, as he contends, the sales did not constitute transactions entered into for profit. He urges that the sales were made for tax saving;

that they were parts of petitioner's plan to distribute his property to his children; that they were accommodation transfers; and that the record is so confusing as to defy a conclusion that real sales were made.

Since most of these propositions have been dealt with hereinbefore, our conclusions may be briefly stated.

The stocks sold were taken from petitioner's investments. They were sold at market prices to a corporation in which petitioner owned no stock, the amount realized being less than the cost to petitioner. They were not reacquired within 30 days, four of them never again coming into petitioner's ownership, and the fifth being purchased from the Ascalot Co. more than two years later at a substantial profit to Ascalot. The consideration agreed to be paid was properly accounted for in the books.

We find no merit in any of respondent's contentions. The sales were complete, valid sales, regular in every way and satisfying every proper test.

There is nothing inconsistent or difficult of understanding, as respondent would have us believe, in the fact that the father, to establish the deductibility of a loss, sold certain stocks which had fallen in value to a company owned by his daughter. Both were dealing for personal advantage—the father, apparently to minimize his taxes by sacrificing certain stocks showing a loss in value; the company, a wholly separate entity, to make an investment in stocks which, in its opinion, held fair prospect of recovery and increasing in value. The question is in no wise complicated nor were the rights of the company circumscribed by the fact that petitioner's daughter owned all of the stock of the Ascalot Co.

The deductions claimed as a result of the sales to the Ascalot Co. were improperly disallowed.

### The Charge of Fraud.

The respondent rests his whole case of fraud on the two stock transactions first above discussed, i. e., the sale of the common stock of the Pittsburgh Coal Co. and the sale of stock of the Western Public Service Corporation. We have incorporated in our findings of fact our conclusion that petitioner did not file a false and fraudulent return for the purpose of evading taxes. But little need be said in amplification. Just as the law cloaks every man with a presumption of innocence, it likewise clothes him with a presumption of good faith in his business dealings. Fraud is never presumed. It must be proven by clear and convincing evidence.

Having carefully considered all of the evidence and all of the inferences properly to be drawn therefrom, we find in our minds no

doubt as to the correct determination. The record before us does not sustain the charge of fraud.

## II.—*The Ownership of the Bank Stocks.*

By amendment to his answer, filed at the hearing, respondent alleges that petitioner was, in 1931, the actual owner of certain bank stocks on which dividends were paid in the taxable year in the amount of $804,466; that petitioner did not report any of such dividends as income but reported $755,397.64 thereof as interest received; that petitioner sustained a loss of $1,875 through the worthlessness of certain of said stocks which he did not claim; and that, accordingly, petitioner understated his income in the net amount of $47,193.36. Wherefore, respondent makes claim for an increased deficiency.

In his brief in chief respondent indicates his position to be that in addition to adding the relatively small item of income to that reported by petitioner, the acceptance of his conclusion as to the ownership of the bank stocks tends to support his position that petitioner dominated the Union Trust Co. at the time of the purchase by it of the stock of the Pittsburgh Coal Co. and Western Public Service Corporation and lends force to his challenge of the credibility of petitioner's sworn testimony.

Respondent correctly states the question here presented to be one of fact, namely, Was petitioner the actual owner of the bank stocks during the taxable year? On this issue respondent has the burden of proof. To establish his contention he must do more than throw doubt on the validity and completeness of the sale. He must establish by a preponderance of the evidence and of the probabilities that a sale did not occur in 1921 when the formal contract of sale was entered into and that petitioner was the actual owner of the bank stocks in 1931.

On its face the written agreement was clearly sufficient to accomplish a sale. The provision permitting termination of the obligation in the event of death of either party was in the nature of an unexecuted option and did not limit or abridge the legal completeness of the contract. The question here presented arises chiefly from other circumstances and the conduct of the parties respecting the contract and payments thereunder in the years 1921 to 1932. The facts on which respondent chiefly relies are that, at various times after the contract with his brother was entered into, petitioner loaned his brother money which was used to purchase additional bank stocks or to exercise rights issued on bank stocks covered by the contract; that at the suggestion of petitioner's financial secretary, the interest rates were increased at various times somewhat paralleling the

trend of dividends paid; that various sums were paid petitioner by his brother and his son for the purpose of equalizing the interest paid petitioner and the dividends paid on the bank stocks.

Addressing ourselves to the question involved, the record shows that petitioner was fully advised of the necessity of divesting himself of the bank stocks to qualify as an *ex officio* member of the Federal Reserve Board. We have his categorical testimony to the effect that he intended to, and did, sell without reservation; that, at the time of the hearing, he did not own, and had not since March 1, 1921, owned any bank stocks; that the signed contract represented the entire agreement without restriction or limitation. We have a contract adequate to accomplish the purpose. The books of the parties reflect a sale in 1921. Petitioner reported the gains and losses on the sale of the stocks in his 1921 tax return and paid taxes accordingly.

In a situation such as is here presented much depends on the assumption with which one starts. Where the first step in a train of circumstances is assigned a particular characterization, it often seems that all succeeding steps partake of this same character. If one starts with the assumption that a man has practiced a deception it is sometimes not difficult so to construe all his subsequent actions as to seem to be a part of a fraudulent plan and thus by one false step so to color the situation as to misconceive the entire truth. But the law approves of no such assumption. Men are presumed to act honestly in their business dealings until the contrary is clearly proved.

The conclusion which respondent asks would require us to reject as unworthy of belief the direct, unequivocal testimony of petitioner and other witnesses. The length of time necessarily consumed in presenting the voluminous evidence in this case, the vigor and meticulous care of counsel in examination and cross-examination, and the intricacy of detail inquired into, have afforded the Board an unusual opportunity to study and weigh the character of the witnesses and to judge of the probability or improbability of the truth of their testimony. This study leads us to the conclusion that petitioner's testimony is entitled to full credence. We accept as the truth his testimony that he sold the stocks absolutely; that there was no agreement, express or implied, to retain any interest therein; that he reserved no right to reacquire them except as appears in the written contract.

To sustain respondent's contention it would be necessary to hold, in effect, that petitioner and his brother entered into a conspiracy deliberately and fraudulently to conceal the truth and misrepresent the facts as to the ownership of the bank stocks. This conclusion the record before us does not justify.

Respondent points to the fact that R. B. Mellon borrowed various sums of money from petitioner and used such funds to purchase additional bank stocks. The record also establishes, however, that petitioner loaned his brother money on many occasions having no relation to this issue. In one such transaction the loan was in the sum of $1,250,000. With certain comparatively insignificant exceptions, the bank stocks purchased were natural accretions to the original list of stocks made available by stock rights. Neither the fact of the purchase of such stocks with money borrowed from petitioner nor the pledging of the same to secure the repayment of the loan which had been added to the R. B. Mellon indebtedness is inconsistent with petitioner's contention that he made an absolute sale.

Respondent also lays great stress on the facts that the interest rate was twice increased, closely paralleling the dividends paid and that, by a final payment, interest paid to petitioner and dividends received by R. B. Mellon were brought into exact balance. However impressive these facts may seem when baldly stated, the record contains a reasonable explanation. When petitioner's financial secretary, who had previously, without petitioner's knowledge, suggested to R. B. Mellon that the interest rate be increased, was asked to recount the conversation that occurred on the occasion when the equalizing payment was under discussion, he stated:

\* \* \* Mr. R. B. Mellon called me in and asked me if I would check an interest calculation that he had caused to be made. It was an accounting of all of the dividends that he had received, and all of the interest that he had paid; and his remark was, as I recall the remark, "I do not care to profit by this, and I want to pay Andy the entire amount of earnings that I have received, over and above the interest that I have paid."

The testimony of this witness was to the same effect when asked to explain the increase in the interest rate.

Adequately to appreciate the significance of the above quoted statement, it is necessary again to recall that these men were not only brothers, but intimate business associates. It is necessary also to realize that the then pending appointment of the petitioner to official position was deemed by him and his brother alike to be both an honor and a sacrifice. That R. B. Mellon was proud of the honor that was to be conferred on his brother was but a normal reaction. That he did not care to profit from the situation and desired to do whatever he might to lessen the sacrifice was, under the intimacy of relationship between them, likewise a normal reaction.

Thus it is that the simple statement quoted above is pregnant with the whole truth of the matter and constitutes complete refutation of the inference respondent asks us to draw. The reasons for the increases in the interest rate, for the equalizing payment, for the transfer

of the obligation to Paul Mellon without profit are one. R. B. Mellon did not care to profit by reason of the appointment of his brother to office.

Considering all of the evidence and weighing all of the probabilities, we conclude that the respondent has not sustained his burden of showing that in 1931 the bank stocks belonged to petitioner. It follows that the dividends paid on the bank stocks were not taxable to him.

### III.—*The McClintic-Marshall—Bethlehem Transaction.*

(This issue is dealt with *infra* by Mr. Turner.)

### IV.—*The Liquidation of Union Construction Co.*

In this issue we are confronted by the question of the amount of gain realized by petitioner from the liquidation of Union. The distribution in liquidation was preceded by the Union-Koppers reorganization and the Union-Pitt reorganization, both transactions being admitted by respondent to be statutory reorganizations. In the notice of deficiency, respondent recognized the regularity and statutory completeness of these reorganizations. The only change made by respondent was in the March 1, 1913, value of McClintic-Marshall Construction Co. stock used as a basis in determining petitioner's gain. In his answer, however, respondent alleged in effect, and on brief contends, that since the reorganization and the liquidation were but steps in a single comprehensive plan, the paramount object of which was the liquidation of Union, the receipt by the stockholders of the stock of Koppers and Pitt and the remaining assets of Union should be treated as the receipt of stock of parties to a reorganization and "other property" under section 112 (c) (1),[2] under which the gain, computed as a unit, is recognized to the extent of the fair market value of the "other property." Computed in that manner, there is no proration of the basis of the petitioner's Union stock and on the facts in this case the recognized gain is an amount equal to the fair market value of the assets of Union exclusive of the Pitt and Koppers stock.

Petitioner contends that the reorganizations and the liquidation were separate and distinct, that the stock received pursuant to the two reorganizations is free of tax, and that the gain on the liquida-

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

   (c) *Gain from exchanges not solely in kind.*—

   (1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

tion is the difference between the fair market value of the assets received and the basis to him of his Union stock after proration on account of the two reorganizations.

Although we have found as a fact that the Union-Koppers and the Union-Pitt reorganizations were parts of a plan for the liquidation of Union, the conclusion asked by respondent does not follow. The same question was considered by the Board in *Rudolph Boehringer*, 29 B. T. A. 8, wherein it was held on substantially similar facts that section 112 (g)[3] governed the distribution pursuant to a reorganization. The consequence of this holding was to require a proration of the basis of the stock of the distributing company between the old and the new stock in determining gain on the liquidation. The question was again presented in the recent case, *North American Utility Securities Corporation*, 36 B. T. A. 320, where we affirmed the holding in the *Boehringer* case and observed:

The distribution of Newport Industries stock is conceded to have been pursuant to the plan or reorganization and at the time of that distribution there was no surrender by the stockholders of their old stock or any agreement to surrender it at any time in the future. The fact that their old stock was not surrendered brings this transaction squarely within the terms of section 112 (g) and has been emphasized as a controlling factor in the *Boehringer* case and the *Gross* case, *supra* [88 Fed. (2d) 567]. This distribution taken alone is clearly governed by section 112 (g). The respondent argues that this distribution can not be considered alone, but must be considered as a step in a single transaction which includes the second distribution. We find no authority which requires this result in the situation before us. The distributions were carried out as separate transactions and each transaction specifically falls within separate sections of the statute. We see no compelling reason for disregarding what was actually done when it was apparently done in good faith for the purpose of obtaining the benefits clearly conferred by the separate provisions of the statute. We find no authority for holding that section 112 (g) is not applicable where a reorganization is part of a plan of liquidation. * * *

\*       \*       \*       \*       \*       \*       \*

That the two distributions should constitute one is the keystone of the respondent's argument and with it falls his whole case. Since they were separate distributions and separate transactions there was no "exchange" of stock in the Newport Co. for stock of Newport Industries, Inc. There was no surrender of the former in return for the distribution of the latter, and such an "exchange" is necessary to the application of sections 112 (b) (3), (c) (1), and (e) for which respondent is contending. Furthermore, since the two distributions are separate transactions it is immaterial that the first distribution may have been in liquidation as well as pursuant to a reorganization, because the liquidation section (115 (c)) is expressly limited by the reorganization provisions (section 112) and therefore section 112 (g) would apply under the

---

[3](g) *Distribution of stock on reorganization.*—If there is distributed, in pursuance of a plan of reorganization, to a shareholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such corporation, no gain to the distributee from the receipt of such stock or securities shall be recognized.

## 1060

specific terms of both sections. This is clearly held by the decision of the Circuit Court of Appeals for the Fifth Circuit in *Gross* v. *Commissioner, supra.*

\*      \*      \*      \*      \*      \*      \*

Thus, in the *Gross* case, even though the distribution was in liquidation as were later distributions in the same case, section 112 (g) was held to govern because of the specific limitation of section 115 (c) by the provisions of section 112. The identical reasoning is applicable in the case at bar and is controlling.

The *Gross* case cited in the foregoing quotation is clearly in point. There the stockholders of corporation A resolved to transfer to corporation C all of the assets of A, excluding all cash in excess of $100,-000 and certain stocks and bonds, in exchange for stock of C, which was to be distributed directly to the stockholders of A. The stockholders of A also resolved at the same time not to distribute the remaining assets of A immediately but to have A hold them until such time as a distribution and dissolution should be deemed advisable. The above plan was carried out and distribution of most of the assets of A was accordingly made. Within three weeks thereafter all but a small part of the remaining assets of A were distributed in partial liquidation of A, and the remaining assets were distributed about a year later in final liquidation of A. The Board held that there was no reorganization and that section 115 (c) applied. The Circuit Court of Appeals reversed the Board for treating the distribution of the C shares to the A stockholders as part of a liquidating distribution under section 115 (c) and held that section 112 (g) applied to that distribution. The court held further that 115 (c) applied only to the later liquidating distributions.

Applying the foregoing decisions to the facts in this case, it appears that the petitioner was correct in the theory underlying his computation of gain upon the Union liquidation.

### V.—*The Payments by Union Construction Co. and Pitt Securities Corporation for the Account of Petitioner.*

A further issue arising from petitioner's relations with Union and Pitt involves the determination of the proper treatment of the sum of $169,479.33 comprising payments made by Union and Pitt for the account of petitioner on account of obligations of McClintic-Marshall not assumed by Union or Bethlehem and chargeable to petitioner and the other stockholders of McClintic-Marshall, either as transferees of McClintic-Marshall or as obligors of Union's debts assumed by them upon its liquidation.

The record establishes, and we have found as a fact, that these payments constituted dividends and not loans to the stockholders.

Though the items were carried on the corporate books as charges against the stockholders and on the petitioner's books as accounts payable and notwithstanding the repayment by the stockholders in 1934, other evidence of record convinces us that in the taxable year they were not regarded as obligations requiring repayment, but represented, in fact, dividends within the meaning of section 115 of the revenue act. Interest was neither charged by the corporation nor paid by the stockholders. Although other items of expense for the account of the stockholders were paid by the corporation and reimbursement made currently by the stockholders, the items here involved remained on the books. The most outstanding fact is that during the year 1932 the company distributed as dividends an aggregate amount of $1,100,000, of which petitioner received $330,000, but made no effort to recoup the outstanding accounts charged against the four stockholders. The explanation for this failure to follow the normal course of conduct, that one of the stockholders "needed the money", scarcely commends itself as adequate. The items should accordingly be added to petitioner's income.

A further ruling is necessary as to the treatment of these items with respect to the computation of tax. Certain of the items, aggregating $29,191.33, were paid by Union and Pitt for the petitioner as a transferee of the assets of McClintic-Marshall. These items were debts of McClintic-Marshall, and, therefore, should be added to the adjusted basis of the petitioner's common stock of McClintic-Marshall, after apportioning that basis between the McClintic-Marshall common and the Union stock, as indicated in the findings of fact.

Further amounts paid by Pitt for the petitioner, aggregating $139,-577.03, represent obligations specifically assumed by him in consideration of the transfer of Union assets to him and the other stockholders in complete liquidation of that corporation. In computing his net gain from such liquidation, therefore, liabilities so assumed and paid are deductible from the gross value of the petitioner's distributive share. *O. B. Barker*, 3 B. T. A. 1180; *Benjamin Paschal O'Neal*, 18 B. T. A. 1036; *Sigmund Spitzer*, 23 B. T. A. 776; *Edward S. Harkness*, 31 B. T. A. 1100.

The final item of $710.97 must also be deducted from the petitioner's gain from the Union liquidation, since it was the petitioner's share of the debt of Union erroneously charged to the petitioner and paid by him. That debt must be accounted for before a correct computation of the petitioner's gain from such liquidation can be made and, therefore, is in the same category as the payment of $139,577.03 above mentioned.

### VI.—*The Valuation of the Stock of McClintic-Marshall Construction Co.*

In his tax return, in computing gain on the sale of Bethlehem bonds acquired as hereinbefore outlined and on the liquidation of Union, petitioner used a tentative figure of $353 per share as the fair market value on March 1, 1913, of the common stock of the McClintic-Marshall Construction Co. Respondent reduced this figure to $158.54. In his petition taxpayer claims a value of $500 per share.

Addressing ourselves to the question thus presented, it is noted that although the company had enjoyed a rapid rate of growth from its organization in 1901 to 1908, its record thereafter to March 1, 1913, is not impressive. In 1908 it had net earnings of $962,000. In 1909 and 1910 earnings fell to $400,000 and $436,000, respectively. Tonnage output fell proportionately. In 1911 tonnage output increased and with it earnings rose to $755,000, but in 1912 output fell off sharply and earnings fell to $219,000. For the fiscal year ended January 31, 1913, output made a slight gain and earnings rose to $331,000. Total earnings from 1901 through the fiscal year 1913 aggregated $5,593,000. The earnings per ton of output fell from $8.66 in 1908 to $3.13 in 1913, with a low figure of $2.16 in 1912.

For the seven-year period ended in 1913 the average earnings were $563,000, the average profit per ton was $5.78. Though plant capacity had increased from 30,000 tons in 1901 to 153,000 tons in 1913, neither the tonnage output nor earnings had kept pace. It can not be overlooked that the earnings for the ten months of 1901 were $120,000 while those of 1912 were but $219,000, and those of 1913 were $331,500. Although the low earnings of 1912 and 1913 were in part due to the Panama Canal contract, this was but one fact in the aggregate of the experience of the company and can not be said to explain away the general downward trend in the years from 1908 to 1913. The record also shows that, for the first time since 1903, the company failed to pay a dividend on its common stock for the fiscal year ended January 31, 1913.

Viewing this record, it is our judgment that the estimate of future earnings of $1,000,000 per year which formed the basis for the opinions of value given by most of petitioner's witnesses was not warranted by the experience of the company and that their opinions must be discounted accordingly. Though it be true that the average earnings of the company in the years subsequent to 1913 exceeded a million dollars a year, there was little basis in the record of the years prior to cause one to think the earnings would jump from $331,500 in 1913 to $1,012,000 in 1914.

In connection with the earnings subsequent to 1913 it is noted that after reaching a million dollars in 1914 they fell to $760,000

in 1915.   The large earnings in the years 1917 through 1919 were undoubtedly favorably influenced by the abnormal conditions existing throughout the world.

Thus it is that we are convinced that the consensus of opinion of the taxpayer's witnesses that on March 1, 1913, the company had a total value of $15,000,000, and that the common stock had a fair market value of approximately $475 per share, was not justified by the history of the company and the facts known on the basic date.

On the other hand, we are convinced that the opinions of respondent's witnesses, which varied from $140 to $160 per share, were arrived at by too strict an adherence to mathematical formulae and gave too little weight to the intangible values established by the record.   We also believe these witnesses gave undue weight to the loss on the Panama Canal contract.   Despite the downward trend from 1908 to 1913, the record demonstrates that this company had had an unusually rapid growth without the investment of additional capital, enjoyed excellent management, and possessed almost unlimited financial support.   Without recitation here of the other similar facts appearing fully in our findings of fact, we are of the opinion that the values found by these witnesses are much below the actual value of the stock.

We have found as a fact that the common stock of the McClintic-Marshall Construction Co. had a fair market value on March 1, 1913, of $300 per share.   This value was arrived at by a study of all of the evidence on the subject, both factual and opinion.   It will serve no useful purpose to attempt to review all of the many factors and considerations entering into this final judgment of value.   Sufficient to say that it represents the result of weighing all pertinent facts revealed by the record as known on the basic date; of giving force to prospects then reasonably to be expected to materialize in the future; of considering the trend of conditions in the then business world and with especial regard to the specific industry; of studying the various formulae employed by the several witnesses and of attributing to the opinions of these witnesses such weight as in our judgment the facts show them to be entitled to receive.   The reasonableness of the judgment so arrived at has been tested by reference to subsequent history and found to have been justified.

The figure of $300 per share, found to be the fair market value on March 1, 1913, of the common stock, together with the figure of $130 per share, stipulated to be the value of the preferred stock on such date, will be used in computing the gain realized by petitioner on the sale in the taxable year of bonds of the Bethlehem Steel Co. These figures will, likewise, be used in computing the gain to petitioner on the liquidation of the Union Construction Co.

## VII.—*The Contributions Issue.*

The issue as to charitable contributions was raised by affirmative allegations in taxpayer's petition and amendments thereto. He did not claim the deduction here involved in his return. Briefly stated, it is alleged that in 1930 petitioner created an educational and charitable trust to which he gave various sums of money, securities, and certain valuable works of art, in pursuance of a plan, the chief object of which was to establish a great national gallery of art. It is alleged further, and here contended, that in the taxable year petitioner gave to this trust five paintings which were of a then present value of $3,247,695; that the trust was organized and operated exclusively for educational and charitable purposes; that no part of the net earnings of the trust inured to the benefit of any private shareholder or individual. On the basis of such allegation and the proof of record petitioner asks a deduction from income within the limits allowed by statute.

On his part, respondent contends that the trust does not meet the statutory tests; that the discretion vested in the trustees is too broad and that the purposes of the trust are vague; that the gifts were not bona fide and were not completed by delivery; that petitioner has never parted with dominion over the paintings; that enjoyment has never inured to the people of the United States; and that at the time of the hearing petitioner had not caused plans to be drawn or made any commitment to build or endow a gallery in Washington, or elsewhere.

The first object of scrutiny should be the instrument creating the trust. On careful reading there can be no doubt that in itself it was in all respects adequate to create an educational and charitable trust. It conforms to every proper test in form, announced purpose, and limitation. That the trust was broad in concept and indefinite in designating its beneficiaries argues for its validity, not its infirmity. Textbook writers agree that an essential of a public trust is that it be broad in its scope and indefinite as to its specific beneficiaries. From these very facts it derives its character. Such is the law of Pennsylvania, where the trust was created. In *Thompson Estate*, 282 Pa. 30; 127 Atl. 446, the court observed:

> The fact that no fixed charity is described, the power of selection having been given by the decedent to another, does not render the trust uncertain, if some tribunal has been designated for the naming of those who shall benefit. * * * It is immaterial how vague, indefinite and uncertain the objects of the testator's bounty may be, provided there is a discretionary power vested in someone over its application to those objects.

But, respondent objects, no completed gift was made in the taxable year. He contends that there was no delivery of the paintings to the trust. This objection is fully met by the general rule of law that where a deed of gift under seal is executed and delivered no manual delivery of the property is necessary. Here the gift was accomplished by formally executed deed of gift under seal, accompanied by delivery of the instrument. Moreover, it was held *In re Elliott* (1933), 312 Pa. 493; 167 Atl. 289, "constructive delivery is always sufficient where actual manual delivery is either inconvenient or impracticable." Here the property was of great value and had been stored in a specially fitted room at the Corcoran Art Gallery for safe keeping. When petitioner executed the deed of gift and delivered it to the trustees, together with a directory letter evidencing a then present intention to make a gift, and received from them a letter accepting the gift, the paintings being at the time in the possession of a third party located in Washington and manual delivery being obviously both inconvenient and impracticable, constructive delivery took place. Thereupon the key to the storage room containing the paintings previously held by petitioner in his own right became the property of petitioner as a trustee of the trust to which the property had been given. It would require a plain distortion both of fact and of law to hold that on the facts here present there was no delivery. *Smith* v. *Commissioner*, 59 Fed. (2d) 533; *Owen* v. *Commissioner*, 53 Fed. (2d) 329; *Reese* v. *Trust Co.*, 218 Pa. 150; 67 Atl. 124.

Further objection is raised that enjoyment of the paintings has not yet been permitted to the public; that at the time of the hearing no plans or commitments to build a gallery had been adopted. In *William T. Bruckner et al., Trustees,* 20 B. T. A. 419, addressing itself to this question of deferred enjoyment, the Board said:

Its conservation during a wise consideration of how best to fulfill the charitable purpose is not at variance with the clear legislative purpose of the deduction, and the statute should not be so narrowly read as to exclude situations so plainly within its beneficent intendment.

So it is here. The maturing of a project so vast in scope as that indicated by petitioner in the deed of gift is not a matter of days or weeks, but of years. That petitioner held a persisting intention to further the purposes of the trust is indicated by his gifts in subsequent years.

Our conclusion in the matter is indicated in our findings of fact and in the above observations. We are convinced that the trust created by petitioner was a valid legal trust, organized and operated exclusively for educational and charitable purposes and that in the

# 1066

taxable year petitioner made a valid gift to the trust of the property in question. The value of the gift has been stated in our findings of fact.

*III.—The McClintic-Marshall Corporation—Bethlehem Steel Corporation Transaction.*

TURNER: In his income tax return the petitioner reported no gain and claimed no loss upon the distribution of the Union Construction Co. stock and the Bethlehem stock and bonds to him as a stockholder of the McClintic-Marshall Corporation. It is his position that the Union stock was received by McClintic-Marshall in a reorganization under the clause (B) of section 112 (i) (1)[4] of the Revenue Act of 1928, wherein McClintic-Marshall transferred a portion of its assets to Union for more than 80 percent of its stock and distributed the stock to its stockholders pursuant to the plan of reorganization. He further contends that after that reorganization had been completed McClintic-Marshall then transferred all of its assets (being the total assets as they were in the beginning less the assets transferred to Union) to the Bethlehem Steel Corporation in a reorganization under clause (A) of section 112 (i) (1), supra, for 240,000 shares of Bethlehem common stock and $8,200,000, face value, Bethlehem 4½ percent serial Gold bonds, which stock and bonds were distributed to the stockholders pursuant to the plan of reorganization. He claims that these two transfers were separate and independent of each other and were therefore reorganizations in and of themselves and that both the distribution of the Union stock and later the distribution of the Bethlehem securities fall within the provisions of section 112 (g)[5] of the act, under which the gain to the stockholders on these distributions is not to be recognized.

---

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corpration, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders, or both, are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

\* \* \* \* \* \* \*

(j) *Definition of control.*—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

[5] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(g) *Distribution of stock on reorganization.*—If there is distributed, in pursuance of a plan of reorganization, to a shareholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corpora-

The respondent in his notice of deficiency took the position that the transaction with Bethlehem was not a statutory reorganization, claiming that Bethlehem did not acquire substantially all of the assets of McClintic-Marshall. He computed the gain on the distribution of the Bethlehem securities as the fair market value of the said securities less that portion of petitioner's basis for his McClintic-Marshall stock remaining after allocating a proportionate part of that basis to the Union Construction Co. stock and the Bethlehem securities received. He made no computation of gain nor addition to petitioner's taxable income in respect of the Union stock received.

The respondent now claims, and has affirmatively pleaded in his answer, that the gain from the distribution by McClintic-Marshall to its stockholders of the Union stock and the Bethlehem securities is to be recognized under the provisions of section 112 (c) (1)[6] of the act, to the extent of the fair market value of the Bethlehem stock and bonds. He still makes no claim that the McClintic-Marshall—Union transaction was not a reorganization. His reasoning is that the distribution of the Union stock and the Bethlehem securities were distributions in complete liquidation, and, taken together, were received by the stockholders in full payment in exchange for their McClintic-Marshall stock within the meaning of section 115 (c)[7] of the statute; that the exchange in liquidation was also in pursuance of a plan of reorganization because the distribution of the Union stock, an essential step in complete liquidation, was pursuant to the plan of reorganization between McClintic-Marshall and Union and the Union stock was therefore the stock of a corporation a party to the reorganization; that the Bethlehem—McClintic-Marshall transaction, not being a reorganization, the Bethlehem securities were not securities of a corporation a party to the reorganization and the exchange, in liquidation, of the McClintic-Marshall stock for Union stock and Bethlehem securities was not

tion, no gain to the distributee from the receipt of such stock or securities shall be recognized.

[6] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(c) *Gain from exchanges not solely in kind.*—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

[7] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(c) *Distributions in liquidation.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock \* \* \*. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. \* \* \*

**1068**

"solely" for stock of a corporation a party to the reorganization (stock of Union) within the meaning of section 112 (b) (3),[8] but also for "other property" (Bethlehem securities) and the gain from such exchange is to be recognized under section 112 (c) (1), *supra*, to the extent of the fair market value of the "other property."

The respondent makes the further claim that regardless of the relation between the McClintic-Marshall—Union transaction and the McClintic-Marshall—Bethlehem transaction and regardless of whether or not it is held that the fabricating assets were all or substantially all of the assets of McClintic-Marshall at the time of their disposition under the Bethlehem contract, Bethlehem still was not a corporation a party to a reorganization within the meaning of section 112 (i) (1) (A), *supra*, and its stock and bonds were not therefore the securities of a corporation a party to the reorganization for the reason that the fabricating assets of McClintic-Marshall were actually acquired not by Bethlehem, but by Midvale and two other subsidiaries of Bethlehem, all three of which were corporations separate and distinct from Bethlehem.

The petitioner's contention, that the gain realized by him upon the distribution by McClintic-Marshall of the Bethlehem securities is not to be recognized in the computation of his taxable income, rests entirely upon the claim that the McClintic-Marshall—Bethlehem transaction was a statutory reorganization and that the Bethlehem securities were the securities of a corporation a party to the reorganization and were distributed pursuant to the plan of reorganization. He can be sustained only by a finding that Bethlehem acquired "substantially all the properties" of McClintic-Marshall within the meaning of clause (A) of section 112 (i) (1) of the Revenue Act of 1928, *supra*. There is no contention that the Bethlehem transaction was a transaction wherein McClintic-Marshall transferred assets to a corporation which immediately after the transfer was controlled by McClintic-Marshall or its stockholders so as to make the transaction a reorganization within the meaning of clause (B) of the section mentioned.

When the negotiations between Bethlehem and McClintic-Marshall were started in the summer of 1930, and when the general understanding was reached in October following, as to the assets to be acquired and the price to be paid, there was no intention on the part of

---

[8] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\*     \*     \*     \*     \*     \*     \*

(b) *Exchanges solely in kind.*—

\*     \*     \*     \*     \*     \*     \*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

either corporation that Bethlehem should acquire all or substantially all of the assets then owned by McClintic-Marshall. In fact it was definitely understood that the only assets under consideration were the fabricating assets, which in value constituted about one-third of the total assets of McClintic-Marshall.

When the understanding as to assets and price had been reached, the lawyers were instructed to draw up the contracts. They were further instructed to draw the contracts in such a manner, if possible, as to prevent the recognition of taxable gain to McClintic-Marshall, or its stockholders. Bethlehem, of course, was not primarily concerned in the recognition or nonrecognition of gain to McClintic-Marshall or its stockholders, but it did instruct its attorneys to cooperate with the attorneys of McClintic-Marshall in accomplishing, if possible, the desired result.

The efforts of the attorneys to prevent recognition of gain resulted in the organization of the Union Construction Co. on October 27, 1930. It was intended that the Union Construction Co. should be used as a conduit through which the fabricating assets would be transferred to Bethlehem or "nominees", the thought being that Mc-Clintic-Marshall would transfer the fabricating assets to Union for all of its stock, which would be issued directly and proportionately to the stockholders of McClintic-Marshall, and that Union would thereupon transfer the said fabricating assets to Bethlehem or "nominees" in exchange for the Bethlehem common stock and bonds agreed upon, which stock and bonds would be issued directly to the stockholders of Union, and Union would thereupon be dissolved. After drafting and redrafting contracts designed to make the transfer in the manner outlined, the plan of procedure was changed in December of 1930 at the instance of McClintic-Marshall, but no change in the substance of the transaction was made or contemplated. Under the new plan of procedure the assets not involved in the Bethlehem transaction were to be transferred to the Union Construction Co. so that on the date of formal conveyance of the fabricating assets to Bethlehem, or "nominees", McClintic-Marshall would actually hold only the fabricating assets to be so conveyed.

Our first question, and the one which has received most of the attention of counsel, then is whether or not McClintic-Marshall could or, on the facts here, did bring the transaction to dispose of a part of its assets to Bethlehem or "nominees" within the intent and meaning of section 112 (i) (1) (A), *supra*, by transferring the remainder of its assets to Union prior to the formal conveyance of the fabricating assets under the contract with Bethlehem. In considering the question stated we shall refer to the conveyance of the fabricating

assets as if actually made to Bethlehem instead of subsidiary corporations, separate and distinct from Bethlehem.

The above question is answered in the negative by the United States Circuit Court of Appeals for the Fourth Circuit in *Helvering* v. *Elkhorn Coal Co.*, —— Fed. (2d) —— (Oct. 18, 1937), wherein the court reversed the decision of the Board reported at 34 B. T. A. 845. The court said in part:

A careful consideration of the evidentiary facts discloses no purpose which could have been served by the creation of the new company and the transfer of the assets to it, except to strip the old company of all of its properties which were not to be transferred to the Mill Creek Company, in anticipation of that transfer. The creation of the new company and its acquisition of the assets of the old was not a corporate reorganization, therefore, within the meaning of the statute or within any fair meaning of the term "reorganization". It did not involve any real transfer of assets by the business enterprise or any rearranging of corporate structure, but at most a mere shifting of charters, having no apparent purpose except the avoidance of taxes on the transfer to the Mill Creek Company which was in contemplation. To use in part the language of the Supreme Court in *Gregory* v. *Helvering*, 293 U. S. 465, 469, it was "simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business," but to give to the intended transfer to the Mill Creek Company the appearance of a transfer of all the corporate assets so as to bring it within the non-recognition provision of section 203 (h) (1) (A).

\* \* \* \* \* \* \*

We do not see how that case [*Gregory* v. *Helvering*] can be distinguished from this. If the property which was to be transferred to Mill Creek had been transferred to a new company created for the purpose and had been by that company transferred to Mill Creek, no one would contend that there was a distinction;[9] and certainly there is no difference in principle between creating a subsidiary to take and convey the property to the intended transferee and creating a subsidiary to take over the other assets and having the old company make the transfer. In either case, the apparent reorganization is a mere artifice; and it can make no difference which of the affiliated corporations makes the transfer of assets which it is desired to bring within the non-recognition provisions of the statute.

While the above decision of the Circuit Court of Appeals in *Helvering* v. *Elkhorn Coal Co.*, *supra*, in our opinion definitely disposes of this issue, we are of the further opinion that this case, on its facts, is a much stronger case for the respondent and that the claim of the petitioner that the Bethlehem transaction was a statutory reorganization would fall of its own weight even if the court had adopted the view, expressed by Judge Watkins in his dissenting opinion and by the

---

[9] The transaction there described by the court is an exact duplicate of the original plan worked out by the attorneys in the McClintic-Marshall—Bethlehem transaction in their effort to prevent, if possible, the recognition of gain to McClintic-Marshall or its stockholders.

Board in its majority opinion, that the Elkhorn Coal Co. did serve a business purpose and that *Gregory* v. *Helvering* did not apply. It was the view of Judge Watkins that the Elkhorn Coal Co., although organized for the specific purpose of avoiding the recognition of gain by literal compliance with the reorganization provisions of the statute, did serve a business purpose since it did continue in existence as a corporation and did thereafter own and operate the properties transferred to it. Similarly, the majority of the Board was of the opinion that the transfer to the Elkhorn Coal Co. "was for a legitimate business purpose and was intended to be a permanent exchange and not merely a temporary holding of title to obscure the real transfer", and, further, that it "was not a device to hide the real nature of the later transfer" to Mill Creek.

Obviously the facts in the instant case do not justify similar conclusions as to the organization of the Union Construction Co., nor as to its subsequent use. It was not organized to carry on any business, nor was it intended that it should continue in existence or even hold any assets for an appreciable length of time. On the contrary, it was organized to serve as a conduit for the transfer of the fabricating assets to Bethlehem and the distribution of the price to be received, namely, the Bethlehem stock and bonds, to the stockholders of McClintic-Marshall, after which, to use the words of the Supreme Court in *Gregory* v. *Helvering, supra,* it was to be "put to death." The use of a corporation for such a purpose and in such a manner was held not to be a reorganization within the meaning of the statute. *Gregory* v. *Helvering, supra.*

Furthermore the use to which Union was actually put places the petitioner in no stronger position. It served no "legitimate business purpose," but merely indulged "in a temporary holding of title to obscure the real transfer." It was in truth "a device to hide the real nature of the later transfer," its sole function being to act as a depositary for the assets omitted from the Bethlehem transaction at the time of the formal transfer to Bethlehem, after which, again using the language of the Supreme Court, it was "put to death." In fact, the petitioner, by his own testimony and by cross-examination of Shaner, a witness called by the respondent, has shown that there was no intention that Union would be more than a temporary holder of the Koppers Co. stock, which stock represented in value $37,500,000 of the total value of $44,245,260.12 of the assets received by Union from McClintic-Marshall. According to these witnesses a plan to put the ownership and control of the Koppers Co. in individuals rather than a corporation had been in process of preparation for a year or two, but that plan was not worked out in time to rid McClintic-Marshall of the Koppers stock prior to the transfer of the fabricating

assets under the agreement with Bethlehem. Counsel for the parties were in a dilemma. If McClintic-Marshall still held the Koppers stock at the time of the Bethlehem transfer there would not be even a ritualistic compliance with the reorganization provisions of the statute in so far as the Bethlehem deal was concerned, and we have already pointed out that the original plan to use Union as a conduit for transfer of the fabricating assets to Bethlehem while McClintic-Marshall continued to hold the Koppers stock and other assets was definitely outside the statute and later so held in *Gregory* v. *Helvering, supra.* Distribution of the Koppers stock and other assets to the stockholders prior to completion of the Koppers reorganization, so as to strip McClintic-Marshall of all "Omitted Assets" at the time of the Bethlehem transfer, would have been the distribution of a taxable dividend or a distribution in liquidation outside of the nonrecognition provisions of the statute. See *Thurber* v. *Commissioner*, 84 Fed. (2d) 815, reversing the Board in *Alice V. St. Onge*, 31 B. T. A. 295. The attorneys were accordingly hard pressed for a plan of procedure that would even give the appearance of a reorganization and not result in recognition of all or a substantial portion of the gain realized both by McClintic-Marshall and its stockholders. The result was the shifting of the "Omitted Assets" to Union. Union conducted no business and it was not intended that it should conduct any business. Its sole function was to hold the "Omitted Assets" in the place of McClintic-Marshall at the time of the transfer to Bethlehem and until a formal distribution of a major portion of those assets could be made to the stockholders of McClintic-Marshall in the form of the Koppers and Pitt reorganizations, after which it was dissolved. It is thus apparent that the only purpose served by the shift of the omitted assets to the Union Construction Co. was to give the appearance in the Bethlehem transfer "of a transfer of all the corporate assets * * * to bring it within the nonrecognition provision" of section 112 (i) (1) (A). "The avoidance or suspension of taxes is not a business", *Electrical Securities Corporation* v. *Commissioner*, 92 Fed. (2d) 593. Accordingly, the transfer of the fabricating assets to Bethlehem under the circumstances described was not a reorganization within the meaning of the statute. *Helvering* v. *Elkhorn Coal Co., supra.*

It is strenuously urged by counsel for the petitioner that the transfer of the "Omitted Assets" to Union was in no way connected with or dependent upon the Bethlehem transaction; that such a disposition of these assets by McClintic-Marshall had definitely been determined upon long prior thereto; that the transfer to Union was made for a definite business purpose separate and apart from the Bethlehem transaction, and would have taken place regardless of the deal with

Bethlehem. The witnesses through whom petitioner sought to establish the above facts were Rodewald, Pittenger, and Patterson. In response to questioning by petitioner's counsel, these witnesses made some rather broad and sweeping statements, but upon examination by counsel for the respondent their admissions as to the information on which the statements were based indicated no definite plan and at the most nothing more than an idea. Both Pittenger and Patterson, when asked as to the basis for their assertions, referred to the annual report of C. D. Marshall to the stockholders of the McClintic-Marshall Construction Co. under date of February 24, 1920, wherein Marshall stated, "As a number of our investments do not have any direct bearing on the manufacturing operation of McClintic-Marshall Construction Company, and the Riter-Conley Manufacturing Company, I recommend that the following investments be sold at actual cost to McClintic-Marshall Corporation, to be organized as a holding company, and for the purpose of taking care of investments that it may be to our interest to acquire in the future." On cross-examination they admitted that after the Marshall report nothing whatever appears in the minutes or records of any of the companies in the group with reference to such a segregation. Furthermore, it is to be noted that the McClintic-Marshall Corporation, a corporation given the same name as that suggested by Marshall in his report, was organized in 1926, but no segregation of the fabricating and nonfabricating assets was made or attempted. Rodewald stated that his conclusions were drawn from his association with the affairs of the company. He was unwilling to say that he had held conferences or talked with any officer or stockholder of the company about the matter prior to the negotiations with Bethlehem. It was suggested in questions by counsel for petitioner and assented to by the witnesses that the retirement of the preferred stock of McClintic-Marshall, first issue, was a step in carrying out a predetermined plan of segregation, but, under questioning by counsel for the respondent, they admitted there was nothing in the records of McClintic-Marshall to form a basis for that claim. Pittenger's strongest statement was that he had discussed the matter with Patterson, an officer of McClintic-Marshall and other corporations in the group. Patterson, even though an officer of the corporation and a holder of some of the preferred stock retired, stated that he could not recollect that the call of the preferred stock, first issue, had anything to do with such a plan.

It is also significant to note that Marshall's idea back in 1920 was that the so-called investment assets be placed in a corporation "to be organized as a holding company and for the purpose of taking care of investments." The Union Construction Co. was not such a corporation. At the time it was organized it was not intended that it

should continue in existence and the facts show that it did not continue in existence for the purpose of taking care of investments or for any other purpose. It was dissolved within five months of the date on which the "Omitted Assets" were conveyed to it. Rodewald did testify that the attorneys received instructions from the stockholders of McClintic-Marshall at a conference held in the forenoon of December 31, 1930, to carry through the transfer of the "Omitted Assets" to Union regardless of the outcome of the transaction with Bethlehem, but the fact nevertheless remains that these instructions did not come until the negotiations with Bethlehem had reached the stage of a general understanding and, considering the events as they actually occurred, the record will not sustain a finding that anything was done in the way of segregating the fabricating and nonfabricating assets except in connection with and as an incident to the Bethlehem deal.

That the primary transaction was the transfer of a portion of McClintic-Marshall's assets to Bethlehem or "nominees" and not a transfer of substantially all of the assets, as claimed by the petitioner, and that the transfer of "Omitted Assets" to Union was merely incidental to the Bethlehem transaction and a part of the mechanics of the transfer to Bethlehem are shown by a review of the events as they occurred. The first of the chain of these events occurred in August of 1930, when Grace, president of Bethlehem, suggested to Marshall, chairman of McClintic-Marshall's board of directors, that Bethlehem would like to acquire the fabricating business and assets of McClintic-Marshall. Before the end of October, after numerous conferences and a study of the audit reports of Price, Waterhouse & Co. covering the fabricating business of McClintic-Marshall, an understanding had been reached as to the assets Bethlehem would acquire and the price it would pay. Neither side of this equation was thereafter changed. The attorneys for both parties were called in and instructed to draw up the contracts to reflect the understanding reached. These attorneys, on the witness stand, disavowed any suggestion that they were negotiators or acted in any capacity other than attorneys. Bethlehem's attorneys were instructed to cooperate with the attorneys of McClintic-Marshall in working out a mode of transfer in such a way, if possible, that no taxable gain should be recognized to McClintic-Marshall or its stockholders.

Prior to the end of October an understanding had also been reached to the effect that all of the income of McClintic-Marshall attributable to its fabricating business, from and after June 30, 1930, should go to Bethlehem as a part of the fabricating assets, except that dividends paid prior to October 1, 1930, by McClintic-Marshall should not be disturbed and except further that the officials of McClintic-Marshall should still receive the customary bonuses upon the basis of the actual

earnings of McClintic-Marshall for the entire year of 1930. On the other hand, it was agreed that McClintic-Marshall should receive in addition to the 240,000 shares of Bethlehem stock and the $8,200,000, face value, of Bethlehem bonds, the dividends and interest paid on such stock and bonds from and after October 1, 1930.

In accordance with their instructions, the attorneys proceeded with the drafting of contracts to effect the transfer of the fabricating business and assets of McClintic-Marshall to Bethlehem in a manner that would prevent, if possible, the recognition of gain to McClintic-Marshall or its stockholders. To carry out that purpose, McClintic-Marshall, on October 27, 1930, organized the Union Construction Co. and subscribed for 10 qualifying shares of its stock. The drafts of the contracts which passed between counsel for the parties during the period from the date on which they began their work down to December 27, 1930, show that the method of transfer first devised was to transfer the fabricating business and assets to the Union Construction Co. for 40 shares of its 50 shares of authorized stock and have these 40 shares issued direct to the stockholders of McClintic-Marshall pro rata, after which Bethlehem would transfer 240,000 shares of its common stock and $8,200,000, face value, of its bonds to Union for all of its assets, whereupon Union was to be dissolved and the Bethlehem securities distributed to its stockholders.

For reasons not definitely shown, the plan of procedure outlined above was changed by counsel for McClintic-Marshall at or about December 27, 1930. On that date Smith, chief counsel for McClintic-Marshall, wrote Moore, chief counsel for Bethlehem, stating in part: " * * * the plan will be to transfer certain assets to Union Construction Company under a reorganization. This being done, Mc-Clintic-Marshall Corporation will transfer and convey all of its remaining assets direct to Bethlehem, or nominees of the latter, likewise under a reorganization."

On December 31, 1930, C. D. Marshall, H. H. McClintic, E. J. Patterson, and E. A. Gibbs, as directors of McClintic-Marshall and seven of its subsidiaries, and the first three named as directors of the Union Construction Co., went through the formalities of holding directors' meetings of the corporations mentioned for the purpose of carrying out the preliminary steps for the transfer of the fabricating business and assets of McClintic-Marshall to Bethlehem. Liquidating dividends of the seven subsidiaries were voted in order to place all of the fabricating assets in McClintic-Marshall for the purpose of transfer to Bethlehem. Formalities of resolutions by McClintic-Marshall and the Union Construction Co. were indulged in to show authority for transfer, as of that date, of various assets of McClintic-Marshall to the Union Construction Co. for 4,990 shares of the Union Construction

Co.'s 5,000 shares of authorized capital stock, a resolution also having been adopted on that date to increase the authorized capital stock of Union Construction Co. from 50 shares to 5,000 shares. All action taken during the afternoon was taken under the direction and supervision of one of McClintic-Marshall's attorneys and was in accordance with a memorandum of procedure brought by him to the meeting, which in sequence was declared to be a meeting of the directors of each of the various corporations.

On the same date, December 31, 1930, Smith wrote Moore, enclosing two copies each of the various contracts covering the McClintic-Marshall–Bethlehem transaction, and suggested that he, Rodewald, and Shepard should come to Moore's office on January 6 "with a view to getting all these papers in final form so that this transaction may be speedily consummated." Copies of all minutes, contracts, and other papers in connection with the transfer of the "omitted assets" to Union were also submitted to counsel for Bethlehem from time to time. According to correspondence between Smith and Moore, the deeds of conveyance had been practically completed by December 20, 1930.

Claiming that the resolutions in the meeting of December 31, 1930, effected the transfer by McClintic-Marshall of the "omitted assets" to Union, the petitioner places great emphasis on a dispute which occurred between counsel at the meeting on January 6 over the wording of that provision of the contract governing the assumption by Bethlehem of McClintic-Marshall liabilities. He claims that the events of that meeting definitely show that the Bethlehem transaction had not been agreed upon until after the Union deal had been completed. While, according to Grace, it was understood in October that Bethlehem was to pay 240,000 shares in stock and $8,200,000 in bonds for McClintic-Marshall's fabricating business and assets and was to assume the liabilities of that business as a going business, counsel had had some disagreement as to the wording of that provision of the contract which was to govern the assumption by Bethlehem of these liabilities. Counsel for McClintic-Marshall wanted a blanket assumption, while counsel for Bethlehem wanted to know definitely what the liabilities were. Price, Waterhouse & Co. had early in December been assigned to make a check of McClintic-Marshall's affairs, including the "Omitted Assets" as well as the fabricating assets, for the purpose of disclosing as far as possible the information Bethlehem's counsel desired. Their report, dated January 5, 1931, listed several contingent liabilities, and at the time of the meeting on January 6, McClintic-Marshall's counsel, under instructions from its stockholders, insisted upon a clause for blanket assumption of the liabilities. Bethlehem's counsel demurred and the work of drafting the con-

tracts came to a halt. Grace and Marshall, the negotiators for the two companies, were advised. Marshall assured Grace that there were no abnormal undisclosed liabilities, and upon that assurance Grace instructed the Bethlehem attorneys to proceed with the drafting of the contract after the manner desired by McClintic-Marshall. There were no further difficulties in putting the contracts into shape. It was Grace's testimony that it was his "understanding that the decks were substantially cleared of any controversial or unsettled question, and that they could go forward with getting the contract into final form." No further conferences were held and all matters of detail in the final writing of the contracts were settled by correspondence or over long distance telephone. The actions of the parties from and after that date definitely indicate that they considered the deal settled as between the two corporations and that the properties would be formally exchanged for securities on the date specified.

Although the agreement between McClintic-Marshall and the Union Construction Co. covering the transfer of the "Omitted Assets" bears the date of December 31, 1930, it was executed on January 15, 1931. The petitioner claims that this delay was purely incidental and had no reference whatever to the Bethlehem deal, and that the transfer to Union was effective as of December 31, 1930. The facts show, however, that, immediately after the conferences in New York on January 6, 7, and 8 between counsel for Bethlehem and counsel for McClintic-Marshall, Schlottman, assistant comptroller for Bethlehem, was sent to Pittsburgh for the purpose of checking with Pittenger the division of the assets of McClintic-Marshall between Bethlehem and the Union Construction Co., and that when Schlottman expressed his satisfaction over the division of these assets between the two companies the contract between the Union Construction Co. and McClintic-Marshall was completed and executed.

Another very significant fact is that Bethlehem or "nominees" did not acquire all of the fabricating assets of McClintic-Marshall but, through the division made by Pittenger and Schlottman, the fabricating assets were reduced and in part transferred by McClintic-Marshall to the Union Construction Co. as an offset against Bethlehem for a part of the purchase price to be paid for the fabricating business and assets. In other words, a portion of the fabricating assets was included in the transfer to Union to take the place of the dividends and interest on the 240,000 shares of Bethlehem stock and the $8,200,000 of Bethlehem bonds which had been paid to the Bethlehem Mines Corporation for the period from and after October 1, 1930. It is thus apparent that the transfer by McClintic-Marshall to the Union Construction Co. was dependent upon the completion of the McClintic-Marshall–Bethlehem transaction, for a portion of the purchase price

paid to McClintic-Marshall for its fabricating business was transferred to the Union Construction Co. as a part of the consideration for the Union capital stock, and this is true regardless of the sequence of dates on which any formality connected with either the transfer by McClintic-Marshall to Union or the transfer by McClintic-Marshall to Bethlehem or "nominees" occurred. The transfer to Union, as it was worked out and actually occurred, could not possibly have been made except as a part of the agreement between McClintic-Marshall and Bethlehem, or simultaneously therewith, or after its completion.

Accordingly, treating the date upon which agreement between Bethlehem and McClintic-Marshall was actually reached as the determining date, Bethlehem did not as a matter of fact acquire and could not have acquired substantially all of the assets of McClintic-Marshall. It was only through such an agreement that the assets to be transferred to Union could be determined.

Considering the events in the order of occurrence, Bethlehem literally and as a matter of fact did not acquire substantially all of the assets of McClintic-Marshall so as to make the transaction a reorganization under clause (A) of section 112 (i) (1), *supra*, and the gain to the petitioner on the distribution to him of the Bethlehem stock and bonds must be recognized. Also in this connection see *Starr* v. *Commissioner*, 82 Fed. (2d) 964. *First Seattle Dexter Horton National Bank* v. *Commissioner*, 77 Fed. (2d) 45; *West Texas Refining & Development Co.* v. *Commissioner*, 68 Fed. (2d) 77; and *Prairie Oil & Gas Co.* v. *Motter*, 66 Fed. (2d) 309.

We are also of the opinion that the respondent is sound in his contention that Bethlehem may not be considered as a party to a reorganization for the reason that the fabricating assets of McClintic-Marshall were actually acquired by Midvale and two other subsidiaries of Bethlehem and not by Bethlehem, and that under such circumstances the distribution of the Bethlehem securities by McClintic-Marshall to its stockholders is a distribution in which the present gain or loss realized must be recognized. The decision of the United States Supreme Court in *Groman* v. *Commissioner*, 302 U. S. 82, is directly in point and is controlling.

In that case the parent corporation, Glidden, corresponding in this case to Bethlehem, was the contracting corporation. Glidden entered into a contract with the stockholders of a corporation referred to as Indiana, agreeing that it would organize a corporation referred to as Ohio, all of the common stock of which would be owned by Glidden, and that Ohio would acquire all of the stock of Indiana, exchanging therefor Ohio preferred stock and Glidden preferred stock. The question was whether or not the parent or contracting corporation,

Glidden, was a party to the reorganization wherein Ohio, its subsidiary, acquired all of the stock of Indiana in the exchange mentioned. It is to be noted that Ohio was not a party to the contract and its rights and obligations were derived solely by its subsequent arrangement or agreement with Glidden, which was the corporation obligated in the contract with the stockholders of Indiana. If Glidden was a party to the reorganization which subsequently occurred between Indiana and Ohio, the stock of Glidden was the stock of a corporation a party to the reorganization and the gain realized by the stockholders of Indiana upon receipt of the Glidden stock was not recognizable under section 112 (b) (3) of the Revenue Act of 1928, *supra*. The Supreme Court, in holding that Glidden was not a party to the reorganization and that the gain on receipt of the Glidden stock was to be recognized, said:

* * * Glidden received nothing from the shareholders of Indiana. Glidden transferred nothing to them. The exchange was between Indiana's shareholders and Ohio. Do the facts that Glidden contracted for the exchange and made it possible by subscribing and paying for Ohio's common stock in cash and prior preference stock, so that Ohio could consummate the exchange, render Glidden a party to the reorganization? No more so than if a banking corporation had made the agreement with Indiana's shareholders and had organized the new corporation, and, by subscription to its stock and payment therefor in money and the banking company's stock put the new company in position to complete the exchange. Not every corporate broker, promoter, or agent which enters into a written agreement, effectuating a reorganization, as defined in the Revenue Act, thereby becomes a party to the reorganization. * * *

It is argued, however, that Ohio was the *alter ego* of Glidden; that in truth Glidden was the principal and Ohio its agent; that we should look at the realities of the situation, disregard the corporate entity of Ohio, and treat it as Glidden. But to do so would be to ignore the purpose of the reorganization sections of the statute, which, as we have said, is that where, pursuant to a plan, the interest of the stockholders of a corporation continues to be definitely represented in substantial measure in a new or different one, then to the extent, but only to the extent, of that continuity of interest, the exchange is to be treated as one not giving rise to present gain or loss. If cash or "other property",—that is, property other than stock or securities of the reorganized corporations,—is received, present gain or loss must be recognized. Was not Glidden's prior preference stock "other property" in the sense that its ownership represented a participation in assets in which Ohio, and its shareholders through it, had no proprietorship? Was it not "other property" in the sense that *qua* that stock the shareholders of Indiana assumed a relation toward the conveyed assets not measured by a continued substantial interest in those assets in the ownership of Ohio, but an interest in the assets of Glidden a part of which was the common stock of Ohio? These questions we think must be answered in the affirmative. To reject the plain meaning of the term "party", and to attribute that relation to Glidden, would be not only to disregard the letter but also to violate the spirit of the Revenue Act.

We hold that Glidden was not a party to the reorganization and the receipt of its stock by Indiana's shareholders in exchange, in part, for their stock was the basis for computation of taxable gain to them in the year 1929.

In this case, as in *Groman v. Commissioner, supra,* the parent corporation, Bethlehem, was the contracting party the only difference in that respect being that in *Groman v. Commissioner* the parent corporation named a specific subsidiary, to be organized, as the corporation which would carry out the contract, while here Bethlehem specified that either it or its "nominees" would acquire the assets involved. McClintic-Marshall was advised, however, that the Midvale Steel Co., a subsidiary of Bethlehem, would acquire the assets to be conveyed except the California and New York real estate, which was to be transfererd to the Pacific Coast Steel Corporation and the Bethlehem Iron & Steel Corporation, respectively, and the deeds of conveyance were so drawn. In this case, as in the *Groman* case, the parent and contracting corporation, Bethlehem, received nothing from McClintic-Marshall, the transferring corporation. Neither did Bethlehem transfer anything to McClintic-Marshall. The assets were acquired by corporations separate and distinct from Bethlehem.

Schlottman, assistant comptroller for Bethlehem and its subsidiary corporations, testified that in all of the dealings between Bethlehem and its subsidiaries and between the subsidiaries themselves great care was taken to conduct those dealings in a manner so as to definitely preserve the separate and distinct entities of the various corporations. It is argued for the petitioner, however, that Bethlehem was in reality the acquiring corporation; that it paid for the assets acquired with its own stock and bonds; and that the acquiring corporations merely held title to the assets for convenience of operation or acquired them from Bethlehem in a subsequent transaction. Such argument can not be reconciled with the testimony of Schlottman. Furthermore, the facts show that the Bethlehem stock used in the acquisition of the fabricating assets of McClintic-Marshall was bought on the open market and that, although it was bought under orders placed in the name of Bethlehem, it was actually paid for by a subsidiary known as the Bethlehem Mines Corporation. The dividends paid on the stock so purchased during the period from the time of its purchase until the transfer to McClintic-Marshall were paid to the Bethlehem Mines Corporation, which, according to the books of account, was the purchaser and the owner of the stock. Bethlehem at no time received credit or showed receipt of the dividends so paid on its books of account. Certain journal vouchers indicate a purchase of the 240,000 shares of Bethlehem stock by Bethlehem from the Bethlehem Mines Corporation and a subsequent sale by Bethlehem to Midvale. One of the vouchers as originally made indicated that the stock was acquired by Midvale directly from the Bethlehem Mines Corporation. This voucher was later changed in April following to show first a purchase by Bethlehem from Bethlehem Mines and then a sale to Midvale. At no place, however, do

the books of Bethlehem itself show a transfer of the 240,000 shares of Bethlehem stock to McClintic-Marshall for its fabricating business and assets. On the other hand, the books of Midvale do show such a transfer by it. With reference to the bonds used in the transaction with McClintic-Marshall, the record shows they were assumed by the Beth-Mary Steel Corporation, another subsidiary of Bethlehem. From certain letters directed by Bethlehem to Midvale, under date of February 15, 1931, it appears that on some date not disclosed Midvale had agreed to assume and did assume all liability to the Bethlehem Mines Corporation for the 240,000 shares of Bethlehem stock and all liability to the Beth-Mary Steel Corporation for the $8,200,000, face value, of bonds and the assumption by it of the $12,000,000 outstanding bond issue of the McClintic-Marshall Construction Co. Bethlehem itself was out nothing and received nothing by reason of its contract with McClintic-Marshall.

A further fact which brings the instant case within the ruling of the Supreme Court in *Groman* v. *Commissioner*, *supra*, is that after the exchange McClintic-Marshall or its stockholders did not have that continuity of interest which, according to the above statement from the Supreme Court's opinion, they must have in a substantial measure in the acquiring corporation. The ownership of the stock and bonds of Bethlehem, which in turn owned the stock of Midvale, the Bethlehem Iron & Steel Corporation, and the Pacific Coast Steel Corporation, which had acquired the assets of McClintic-Marshall, was not such a continuity of interest as would make the exchange "one not giving rise to present gain or loss."

As we have pointed out above, the organization and use of the Union Construction Co. served no business purpose and under the decisions in *Gregory* v. *Helvering*, *supra*, and *Helvering* v. *Elkhorn Coal Co.*, *supra*, the utilization of Union under the circumstances described did not constitute a reorganization within the meaning of the statute. Under these decisions the respondent might well have claimed that all of the gain resulting from the distribution in complete liquidation of McClintic-Marshall, the said distribution including both the Union Construction Co. stock and the Bethlehem stock and bonds, should be recognized. He has made no such claim, however, but has limited his claim under this issue to the gain realized upon the distribution of the Bethlehem securities, and not only has he limited his claim to the gain on the Bethlehem securities, but in computing such gain has treated the McClintic-Marshall—Union Construction Co. transaction as a statutory reorganization and the Union Construction Co. stock as the stock of a corporation a party to the reorganization and as having been distributed pursuant to the plan of reorganization.

Literally, the Union stock and the Bethlehem securities were distributed by McClintic-Marshall to its stockholders without the surrender by them of their McClintic-Marshall stock. Although the authorized stock has since been reduced in amount and the name of the corporation has been changed to William Penn Corporation, the corporation is still in existence and its stock is outstanding. The record indicates that the corporation is being kept alive because there are certain unsettled and contingent liabilities. On the basis of these facts and the admission of the respondent that the Union Construction Co. stock was the stock of a corporation a party to a reorganization, distributed pursuant to the plan of reorganization, the distribution made by McClintic-Marshall of the Union stock and the Bethlehem securities falls directly within the prior decisions of the Board in *Rudolph Boehringer*, 29 B. T. A. 8, and *North American Utility Securities Corporation*, 36 B. T. A. 320. Under these decisions the gain realized by the petitioner on the distribution of the Bethlehem securities is the excess of the fair market value of those securities over that portion of petitioner's basis for his McClintic-Marshall stock which remains after allocating a proportionate part of such basis to the Union stock received. The allocation of basis to the Union stock should be made in accordance with the figures and percentages stipulated by the parties and shown in our findings of fact.

In making the claim that the gain from the distribution of the Bethlehem securities is to be recognized under section 112 (c) (1), *supra*, respondent made the further claim that on the facts stipulated as to the earnings of McClintic-Marshall available for distribution as dividends, the gain so realized and recognized constituted a dividend under section 112 (c) (2)[10] of the act. The application of section 112 (c) (2) can not be reconciled with the decisions in *Rudolph Boehringer*, *supra*, and *North American Utility Securities Corporation*, *supra*, applied above, and is denied.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

[10] SEC. 112. RECOGNITION OF GAIN OR LOSS.

    *       *       *       *       *       *       *

(c) *Gain from exchanges not solely in kind.*—

    *       *       *       *       *       *       *

(2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property.

SMITH, STERNHAGEN, ARUNDELL, VAN FOSSAN, BLACK, and TYSON concur in the result reached in issue III, the McClintic-Marshall—Bethlehem transaction, solely on the ground that it is controlled by the decision of the Supreme Court in *Groman* v. *Commissioner*, 302 U. S. 82.

---

LEECH, concurring: I agree with the result the majority reaches on all issues. As to that involving the Bethlehem–McClintic-Marshall transaction, I concur for the reasons expressed by Murdock.

---

MURDOCK, dissenting and concurring: The evidence shows to my satisfaction that the petitioner is entitled to deduct the loss claimed on the sale of the Western Public Service Corporation stock. I concur in the result reached by the majority of the Board on all other issues although I do not agree with all that is said in the majority opinions. I decide the McClintic-Marshall—Bethlehem reorganization issue against the contention of the petitioner, first, because, on authority of *Groman* v. *Commissioner*, 302 U. S. 82, Bethlehem was not "a party to a reorganization" and, second, because, the subsidiaries of Bethlehem did not acquire "substantially all" of the assets of McClintic-Marshall within the meaning of the statute. *Alice V. St. Onge*, 31 B. T. A. 295; *David Gross*, 34 B. T. A. 395. See also dissent in *Elkhorn Coal Co.*, 34 B. T. A. 845.

---

TURNER, dissenting and concurring: We are not here called upon to consider transactions prompted by normal business motives. In all of the major issues the transactions themselves or the manner of their execution were induced by the desire to reduce taxable income and not by business purposes. With reference to the transfer of the Pittsburgh Coal Co. common stock to the Union Trust Co., the petitioner himself testified that "everything was fixed up for taxes at that time." With reference to the transaction involving the stock of the Western Public Service Corporation, Phillips, senior employee of the petitioner and his brother, R. B. Mellon, and the only witness who had any direct knowledge of the transaction with the Union Trust Co. in respect thereto, stated that he knew of no purpose other than that of creating a loss deduction for income tax purposes. In the case of the sale by the McClintic-Marshall Corporation of its fabricating business and assets, the negotiating parties, after they had agreed upon the substance of the transaction, the assets to be acquired by Bethlehem, and the price to be paid, instructed the attorneys to draw up the contract or contracts in such a manner, if possible, that the assets might be transferred from McClintic-Marshall to Bethle-

hem so as to avoid any recognition of gain to the McClintic-Marshall Corporation or its stockholders. The result of these instructions was the extended experimentation with the various forms of contract, the organization of the Union Construction Co. for use as a conduit in making the transfer to Bethlehem, its actual use for holding the other assets when the formal transfer to Bethlehem was made, and, after that, its dissolution.

Accordingly, we do not have here the case of the ordinary taxpayer who, at the end of the year, shapes his income tax return to reflect the results of business concluded, but the case of a taxpayer who just prior to the end of the taxable year undertakes to shape his business affairs and the results therefrom to match the pattern of the income tax return he desires to file. We have the case of a taxpayer who, prior to the close of the taxable year, checks his gains and estimates the tax due thereon for the purpose of determining whether it is in excess of the amount which he considers as a "fair" amount for him to pay to the Government in the form of income taxes. The survey in the instant case disclosed income taxes greatly in excess of the amount considered "fair" and the transaction with the Union Trust Co. covering the Pittsburgh Coal Co. common stock resulted.

It is well settled that the purpose of tax avoidance does not in and of itself vitiate the legal consequences of a transaction. Furthermore, as the majority opinion points out, "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits, can not be doubted." *Gregory* v. *Helvering*, 293 U. S. 465. But when tax avoidance is the primary motive, as is the admitted case here, the transactions involved are to be subjected to careful scrutiny to determine whether they are "in fact as well as in legal form what the participants" claim them to be. *Percy C. Madeira*, 36 B. T. A. 456; *Robert Wilson Carter*, 36 B. T. A. 598; *James Nicholson*, 32 B. T. A. 977; affd., 90 Fed. (2d) 980; *Sydney M. Shoenberg*, 30 B. T. A. 659; affd., 77 Fed. (2d) 446; *Grace A. Cowan, Executrix*, 30 B. T. A. 296; *Rand Co.*, 29 B. T. A. 467; affd., 77 Fed. (2d) 450; *Harold F. Seymour*, 27 B. T. A. 403; *Harold B. Clark*, 2 B. T. A. 555. And a taxpayer who indulges in transactions primarily for the purpose of tax avoidance does so with his eyes wide open and must face the tax consequences if his judgment has been faulty, the legal advice followed unsound, or the form or ritual indulged in falls short of accomplishing his purposes. For, as the court said affirming *Robert P. Morsman*, 33 B. T. A. 800, at 90 Fed. (2d) 22, "When a taxpayer thus boldly proclaims that his intent, at least in part, in attempting to create a trust is to evade taxes the court should examine the forms used by him for the accomplishment of his purpose

with particular care; and, if his ingenuity fails at any point, the court should not lend him its aid by resolving doubts in his favor."

The petitioner here claims that he has accomplished his purpose and has complied with all legal requirements in connection with all transactions indulged in by him for the purpose of reducing his taxable gain and the amount of tax due thereon. He rests his claim for such a conclusion upon written documents and book entries carefully drawn and made with the primary purpose in mind of reducing taxable net income. On some of the issues the formal documents are supplemented by categorical statements of the petitioner himself. The respondent claims that the documentary evidence so prepared and relied on by the petitioner is at the most in the nature of self-serving declarations and that such weight as might otherwise be given to it is destroyed and nullified by surrounding circumstances, the course of conduct of the parties participating in the transactions, and various statements and acts of the parties themselves and other individuals at times when the tax effect was not in mind.

### Pittsburgh Coal Co. Stock.

On this issue there must have been an actual sale of the Pittsburgh Coal Co. common stock and that sale must have occurred in 1931 if the petitioner is to prevail. The petitioner claims that such a sale did take place in December of 1931, with the Union Trust Co. as the purchaser. The burden was on him to establish that fact and, if he has failed to do so, he is not entitled to have doubts resolved in his favor. *Robert P. Morsman, supra*. In my opinion there is evidence of record which refutes, or to state the conclusion most leniently for the petitioner, casts a definite cloud of doubt on his claim that he made an outright and bona fide sale of the stock to the Union Trust Co., and the evidence submitted by him does not clear away those doubts. For that reason I am unable to agree with the conclusion reached in the majority opinion, that the petitioner has sustained his burden and that a valid sale was made.

That the form of a sale to the Union Trust Co. was indulged in is beyond doubt, but, as we said in *Sydney M. Shoenberg, supra*, "It is well settled that a mere ritualistic compliance with legal forms is not enough." We also have the petitioner's statement declaring an intention to sell the stock to the Union Trust Co. and the further assertion by him that he did sell the stock to that company. In that connection, however, we further find in *Sydney M. Shoenberg, supra*, that "A sale must rest on a genuine intention to dispose of property without reservation or evasion of mind. What is in the minds of the parties is not to be determined solely by self-serving

declarations or testimony of the party interested. It is pertinent to consider all the acts of the parties, the several steps employed, and all other related facts and inferences." In *Rand Co., supra,* the court, in affirming the Board, said:

If the sales by the taxpayers to Trux were complete and final with no understanding with him as to repurchase, the loss was deductible; otherwise not. *Shoenberg v. Commissioner,* 77 Fed. (2d) 446, (C. C. A. 8). The burden was upon taxpayers to establish the above fact. Transactions of this character are necessarily secret, and the real situation is known only to the immediate parties. The Board was not compelled blindly to accept their testimony that there was no such understanding. It could examine the probabilities of such truth * * *.

Further, in *Harold F. Seymour, supra; James Nicholson, supra; Percy C. Madiera, supra; Robert Wilson Carter, supra; James W. Singer,* 32 B. T. A. 177; *D. A. Belden,* 30 B. T. A. 601; *Charles S. Hempstead,* 18 B. T. A. 204; *Albert W. Finlay,* 17 B. T. A. 828; and numerous other cases, we have, in the light of surrounding circumstances, refused to accept categorical conclusions in the testimony of the various petitioners to the effect that actual sales were accomplished. The Board was unwilling to lend its aid in resolving doubts in their favor.

In this connection it seems to me pertinent to review the acts of the parties, the character of the property dealt with, the testimony of the witnesses, and their relation to the transaction and to each other, in order to determine the probability that the petitioner sold and that the Union Trust Co. acquired or intended to acquire as its own and without reservation the 123,622 shares of the Pittsburgh Coal Co. common stock in question.

The transaction took place between the petitioner and H. C. McEldowney, president of the Union Trust Co., and the only testimony bearing directly on the purported sale and purchase is that of the petitioner, who said that he went to the Mellon Bank Building and saw McEldowney at the close of a meeting of the Mellon Bank and told him he would like to sell to the Union Trust Co. his Pittsburgh Coal Co. common stock; that McEldowney asked one or two questions "concerning the amount, and the stock and so forth" and, after being told that the amount in round figures came to $500,000, considered the matter for a moment and said: "All right. Send it up and we will take it." That, according to the petitioner, was "substantially everything that was said."

Having supplied us with the petitioner's version of the transaction, counsel for the petitioner called witnesses from the Union Trust Co. to show its position and attitude in the matter. The witnesses called, however, were subordinates in the bank and disavowed any knowledge of the details or circumstances of the actual trans-

action between the petitioner and McEldowney. Counsel for the petitioner brought out that the stock at the direction of McEldowney was taken up on the books of the bank as an investment and that title was taken in the name of the Acly Co., a partnership composed of officers in the bank, organized for the purpose of holding title to securities belonging to the bank. It was also brought out that there were two similar partnerships, one by the name of Mac & Co. and the other by the name of Clay & Co. It was explained that securities held in trust were transferred to Mac & Co. and that securities held for clients or customers or in any custodian relationship were transferred to Clay & Co. On cross-examination by counsel for respondent, however, it was admitted that Mac & Co. was not even organized until after the Pittsburgh Coal Co. stock had been transferred to Coalesced. It was further admitted that, while the Acly Co. may have been organized for the purpose of holding title to securities owned by the bank, during the year 1930, 36 out of the 39 dividend-paying stocks held by Acly did not belong to the bank but to customers of the bank. Such was the use of Acly at the time the Pittsburgh Coal Co. stock was transferred to it. It was further shown that, during 1931, 17 out of the 27 dividend-paying stocks held by Acly belonged to customers of the bank and not the bank itself.

As to the character of the stock, the petitioner himself testified that it had no actual or intrinsic value and that it had no prospects as a dividend producer. The Pittsburgh Coal Co. had not, according to the petitioner, paid dividends on the common stock "for a large number of years" and the accumulated dividends on its preferred stock were then in excess of $40 per share and at the time of the hearing had increased to approximately $65 per share. The coal business, as affecting the Pittsburgh Coal Co., had been in a decline for more than fifteen years and there was nothing at the time to indicate that anything but a continued decline could be expected. And even though there might be an improvement in the coal business in general, it was the petitioner's opinion that it would not come in time to be of any benefit to the common stockholders of the Pittsburgh Coal Co. The only value that the petitioner was willing to attribute to the common stock of the Pittsburgh Coal Co. was a strategic value for voting purposes. Undoubtedly McEldowney was also fully aware of these facts, since his company had handled the original purchase by the petitioner and his brother of some of these same shares, and in 1929 had sold a $20,000,000 bond issue for the Pittsburgh Coal Co. Yet we are asked to find as a fact that the Union Trust Co. actually purchased, with the funds of its investors and depositors and as an investment, 123,622 shares of that stock, a stock which had no dividend prospects and which the bank had never seen

fit to invest in even during the prosperous days of the Pittsburgh Coal Co., if it had ever known such days.

Another circumstance which seems to me to be of significance in determining the position of the Union Trust Co. in the Pittsburgh Coal Co. stock transaction is the manner of its disposition. The testimony in that connection was given by Korb, one of McEldowney's subordinates. Korb disavowed actual or direct knowledge of the circumstances or terms of acquisition of the stock by the bank. In reality he took up the story in March of 1932, when, according to his testimony, he was instructed by McEldowney to dispose of the stock if and when a reasonable return could be received on the bank's investment therein. Korb's activities in that direction were limited exclusively to calls made to H. M. Johnson, the petitioner's principal personal employee. He stated that he asked Johnson if he knew of any one interested in acquiring the stock and was advised that he knew no one. Korb made no further inquiries of any one and stated that he made no effort to dispose of the stock to any other party or interest, but some two or three weeks later called Johnson a second time and, upon either the second or third call, Johnson asked that a price be quoted. The price was quoted in the form of a memorandum, reading as follows:

Figured for April 25, 1932.

A. W. MELLON.

| | |
|---|---|
| Dec. 30, 1931, 123,622 shares Pittsburgh Coal Company Common Stock ($100 par value) at 4.0445875 | $500,000.00 |
| Cost | $500,000.00 |
| Interest—118 days at 6% | 9,833.33 |
| Stock Transfer Stamps | 4,944.88 |
| Penna. Five Mill Tax | 2,500.00 |
| | $517,278.21 |
| Average price figured on $517,278.21 | $4.18435399 |

Upon the receipt of the above quotation Johnson acquiesced in Korb's proposition and it was then for the first time that Korb, according to his testimony, learned that the stock was to go to the Coalesced Co. instead of the petitioner.

In addition to the fact that Korb actually made no effort to dispose of the Pittsburgh Coal Co. common stock to anyone other than the petitioner, it is interesting to note from his testimony that he knew practically nothing about the stock and made no effort to learn anything about the condition of the company. He could not have informed any prospective purchaser as to the voting rights of the common and preferred stock, nor of the dividend provisions of the preferred stock. He did not know the date of the last dividend

paid on the common stock, nor its dividend record. He knew nothing of the funded debt, and could not say whether the bonds outstanding were mortgage bonds. He had no knowledge as to the holdings of the company, the accessibility of its properties, the acreage in operation nor of the reserve acreage. He knew nothing about the facilities of the company for handling and transporting coal, and made no inquiry as to the value of the properties back of the stock. It is further of interest and significant to note that Johnson, the petitioner's secretary and principal personal employee, was of the opinion that it would have taken the Union Trust Co. about five years to have disposed of the stock on the market at the rate at which it was then being traded.

I am able to reach no other conclusion than that the Union Trust Co. throughout the transaction looked to the petitioner to take up or to provide a taker for the Pittsburgh Coal Co. stock and to pay a reasonable sum for services rendered. It is asking too much for me to believe that a bank such as the Union Trust Co. would purchase for its portfolio, at a price of $500,000, shares of stock which had no dividend prospects and on which no dividends had been paid "for a large number of years", a stock secondary to an issue of preferred stock which at that time had dividends accumulated against it in excess of $40 per share, a stock which the petitioner himself stated had no actual or intrinsic value, and a stock which, according to the petitioner's principal employee, would have required the bank approximately five years to dispose of if it had been dependent upon the open market. And while Korb, under cross-examination by respondent's counsel, did not accede to a description of the stock as a "frozen asset", he did admit that he would not classify it as a "liquid asset."

At this point mention should also be made of the contention of the respondent that the petitioner in reality had no desire or intention of disposing of his Pittsburgh Coal Co. common stock to any interests outside of his family, and the facts and circumstances upon which this contention is based. At some period between 1927 and 1930, probably 1929, petitioner received an offer from Frank E. Taplin to purchase 100,000 shares of common stock of the Pittsburgh Coal Co. at $100 per share and as a down payment Taplin offered a certified check for $500,000. The stock at that time was selling on the market for an amount in excess of $80 per share. This offer the petitioner rejected and stated as his reason therefor that Taplin's chief interest in acquiring the stock of the Pittsburgh Coal Co. was for the purpose of supplying freight for a railroad in which he was interested; that the Pittsburgh Coal Co. was an important factor in the welfare and industrial and commercial life of the Pittsburgh area; that control of

the Pittsburgh Coal Co. by Taplin would have been injurious to Pittsburgh; and for those reasons he would not have sold the stock to Taplin under any circumstances. Prior to his testimony in this connection, however, the petitioner had stated that the Pittsburgh Coal Co. stock had no actual value and no dividend prospects and that the company had been in a bad way for some fifteen years; that his holdings in the common stock of the company were securities that he desired to dispose of and that he "would have desired before that time to have sold the stock" if he had had it before him "and there was the opportunity or the occasion to do so." Yet the stock had been specifically brought to his mind by the Taplin offer of 1929 or thereabouts, and he had refused to consider the offer and took no further steps to dispose of it. It may also be noted here that the only value of any nature that petitioner was willing to attribute to the stock was a strategic value for voting purposes, and it was that strategic voting value as distinguished from value as an investment which apparently caused Taplin to make his offer in 1929 and prompted the petitioner to refuse it. . He admitted from the witness stand that, when he decided "to sell" the block of stock in 1931, he made no effort to learn whether Taplin or any other outside interest might still be interested in acquiring the stock and reiterated that he would not have sold the stock to Taplin in any event, while contending at the same that he made a definite, outright sale of the stock with no strings attached and did not care what became of it. The respondent's explanation, which in the light of the facts seems the more reasonable one, is that it was at all times intended that the stock would eventually be acquired by the Coalesced Co. and that the Union Trust Co. was merely a depository until such time as it might be deemed expedient to transfer the stock to Coalesced. In this connection it is pointed out that R. B. Mellon, petitioner's brother, formed a corporation parallel in almost every respect with the Coalesced Co. and that R. B. Mellon's holdings in the Pittsburgh Coal Co. stock passed directly from him to such corporation without any detours through the Union Trust Co. or other corporation.

If the petitioner had dealt directly with Coalesced and Coalesced had paid to him in December 1931, out of its cash and funds acquired by use of its credit, the sum of $500,000 and had continued to hold the stock as it has since the acquisition thereof in April of 1932, there would be much less cause to doubt the petitioner's claim that an· actual sale was made. *Edward Securities Corporation*, 30 B. T. A. 918; affd., 83 Fed. (2d) 1007; *A. S. Eldridge*, 30 B. T. A. 1322; *Ralph Hochstetter*, 34 B. T. A. 791; *Jones* v. *Helvering*, 71 Fed. (2d) 214; *James E. Wells*, 29 B. T. A. 222. As it is, however, the transaction did not take that course and petitioner's position must stand or fall on the

soundness of his claim that he made an actual and outright sale to the Union Trust Co. during 1931, and to sustain him on that claim we are asked to ignore the facts reviewed above and to conclude that the Union Trust Co. purchased the stock and later found a buyer in Coalesced free and clear of any understanding with the petitioner as to its subsequent disposition.

In *Harold F. Seymour, supra*, we said:

> Though the Board has approved deductions for losses where the evidence was not decidedly more favorable to petitioner than that surrounding the first purported sale, we can recall no case in which approval has been given where the same parties went through almost the identical process in the next year. To approve a single instance requires the resolving of many doubts in favor of the petitioner, but to permit a recurrence of the same procedure in the next year under the circumstances here present overtaxes our credulity. Despite the statement of the parties to the transactions that they were outright sales, we are not convinced that such sales were free and genuine. In our judgment they were lacking in bona fides.
>
> If the transaction of 1927–1928 stood alone the deduction might conceivably have been allowed, but the repetition thereof for the years 1928–1929 in precise parallelism goes beyond mere coincidence. It casts such doubt on the good faith of petitioner in both years as to make it impossible for us to approve the purported sales. The evidence and inferences reasonably to be drawn therefrom lean too strongly against petitioner to permit us to approve the deductions.

While we have before us only the one taxable year, 1931, in line with the holding in the case cited, proof was offered of similar activities of the petitioner in the years 1932 and 1933. In December of 1932 we find the petitioner again going over the matter of his prospective income tax for that year and a review of securities which, if sold, would result in the loss deductions desired for reducing net taxable income. We again find the petitioner and Johnson agreeing upon the use of certain securities, and we find that this time Johnson made the deal with H. C. McEldowney, president of Union Trust Co., the transaction occurring on December 29, 1932. This time, instead of the securities of one company, we find that a number of securities were involved, but in that list we find securities even less attractive as an investment than was the Pittsburgh Coal Co. common stock in December 1931. We find the Union Trust Co. purportedly paying $6,500 for preferred shares of the United Porto Rican Sugar Co., which company was even then in default on an outstanding issue of gold notes and in the same transaction paying $10,400 for $208,000 par value of the gold notes then in default. In the same transaction we find the Union Trust Co. purportedly paying $19,937.50 for 5,500 shares of Missouri Pacific Railroad Co. preferred stock, while in the same transaction it was able to acquire Missouri Pacific Railroad Co. gold bonds having a par value of $219,000 at 75/8 cents on the dollar. To conclude that any normal bank would carry among its investments

securities of such character, let alone make an outright purchase of them, is incredible, and we find that almost immediately the Union Trust Co. took the necessary steps to clear these securities from its portfolio.

In February following Korb received instructions from McEldowney with reference to these securities similar to the instructions in March of the preceding year with reference to the Pittsburgh Coal Co. common stock. Korb, as before, called Johnson and inquired for a purchaser and Johnson advised Korb that he would call him back and let him know. He suggested, however, that Korb quote him a price. In the meantime the market price of the American Locomotive Co. shares had increased from $200,000, the price at which they had been listed in the December transaction, to $240,000. Johnson balked at paying the market price of $240,000, and fixed the price at $215,000. Upon consultation with McEldowney, Korb was instructed to accept Johnson's price. To further offset the apparent profit to the Union Trust Co. on the American Locomotive Co. shares, reductions were made on the "sales" slip in the price at which the Missouri Pacific preferred shares and bonds and the Sugar Co.'s gold notes were transferred to Coalesced. The Sugar Co. preferred stock was listed on the "sales" slip at $6,500, the same price at which it had been included in the December transaction.

Korb, who had been employed by the Union Trust Co. for approximately 20 years, was unable to recall any instance except those described in this proceeding where the Union Trust Co. ever at any time purchased a stock which at the time of purchase was neither earning nor paying a dividend unless the acquisition was in connection with some contract designed to indemnify the bank against loss. Lightbown, chief clerk in the bond department, who had been with the bank since 1921, knew of no other instance where the Union Trust Co. had ever acquired preferred stock in a corporation which was in default on its notes. It is also significant, in my opinion, that the Union Trust Co. did not consider the stock of the Pittsburgh Coal Co. as sufficient collateral on Coalesced's purchase note for $400,000 and within a few days Coalesced, at the request of the bank, deposited as additional collateral Republic of Poland bonds having a par value of $500,000.

In December of 1933 the petitioner and Johnson were again making a survey of the petitioner's affairs from an income tax standpoint and the sale of certain securities was considered. On this occasion Johnson suggested that the Coalesced Co. could use such securities, but the petitioner, according to Johnson, stated that in this instance if the Coalesced Co. desired to acquire the securities it would have to do so through the market, while on the other hand the petitioner testified

that it was Johnson who suggested that the securities be sold on the market and that Coalesced could place a purchase order at the same time. A reason prompting the sale through a broker was that question had been raised about a sale of securities for tax purposes to a family corporation. The result was that Johnson placed an order with the brokerage firm of Moore, Leonard & Lynch to sell the securities in question for the account of the petitioner and at the same time placed a matched order on the part of Coalesced to buy these same securities. The same employees who delivered the securities to the brokerage firm for the account of petitioner brought them back to the office of the petitioner for the Coalesced Co.

All of the securities "sold" by petitioner to the Union Trust Co. at a loss during the years 1931 and 1932 were the securities "sold" for the purpose of creating loss deductions and in each instance, shortly after the close of the year, all of such securities were acquired from the Union Trust Co. by Coalesced.

The petitioner here admittedly elected to decrease the amount of what would otherwise be his taxes by the creation of a loss deduction, and, if the record contained only the evidence of the formalities indulged in by him and the Union Trust Co. in connection therewith, and the formalities later indulged in with reference to the acquisition of the same stock by the Coalesced Co. in April of the following year, and the testimony of the petitioner of his intention to finally and definitely dispose of the stock, we should undoubtedly, in the light of the decisions referred to above, hold that he had sustained his burden of proving a sale to the Union Trust Co. in December of 1931, and that as a result thereof he is entitled to the loss deduction claimed. The evidence of record is not so limited, however, but also includes the detailed circumstances outlined above, which in my opinion definitely cast a cloud of doubt on the claim of the petitioner that the sales were outright and bona fide, doubts which the petitioner has not succeeded in clearing away and, as the court pointed out in *Robert P. Morsman, supra,* the petitioner's ingenuity having failed him in this connection, the Board should not lend him its aid by resolving the doubts in his favor. Again referring to the conclusions of the Board in *Harold F. Seymour, supra,* the nature, condition, and state of the securities involved in the transaction and the recurrence of similar procedure in the following years "under the circumstances here present overtaxes" my credulity. For that reason I am unable to agree with the conclusion reached in the majority opinion with respect to the transaction in December of 1931 between the petitioner and the Union Trust Co. covering the 123,622 shares of common stock of the Pittsburgh Coal Co.

### Western Public Service Corporation Stock.

While I concur in the result reached by the majority on this issue, I am unable to agree that a categorical finding should be made that R. B. Mellon, acting for the petitioner and himself, made a valid sale of 54,000 shares of stock of the Western Public Service Corporation to the Union Trust Co. on December 2, 1931. It is my opinion that the Division erred in denying to the respondent the right to introduce evidence which it was claimed tended to show that the members of the executive committee and the board of directors of the Union Trust Co. used that company for the purpose of going through the formality of sales to it of certain securities, particularly Western Public Service Corporation stock, in December of each year in order to create loss deductions, when as a matter of fact it was understood that shortly after the running of a period of thirty days they would similarly go through the formality of a repurchase of these same securities. It was the position of counsel for the respondent that the evidence offered, when considered with other evidence in the record, would show that the transaction between R. B. Mellon and the Union Trust Co. in respect of the 54,000 shares of Western Public Service Corporation stock was of that character and that no actual sale of the stock was ever made or intended. In my opinion the Division undertook to prejudge evidence which it neither heard nor examined and without knowing what it would show when considered with other evidence of record.

As the record now stands it shows that the Union Trust Co. engaged in similar transactions with other individuals, particularly members of its board of directors and executive committee, who transferred stock to it in December and reacquired the same stock thirty to ninety days later. At or about the same time that R. B. Mellon transferred 54,000 shares of the Western Public Service Corporation stock to the Union Trust Co., William B. Schiller and Roy A. Hunt, members of the board of directors and the executive committee, so transferred and reacquired 5,000 shares and 6,000 shares, respectively, of Western Public Service Corporation stock.

### The Union Construction Co. Liquidation.

The Board has found as a fact that the Union-Koppers and the Union-Pitt reorganizations and the distribution by Union to its stockholders of the Koppers stock and the Pitt stock acquired in those reorganizations were parts of a single plan to completely liquidate Union. With this conclusion I am in hearty accord. In my opinion, however, that finding precludes the holding thereafter made that the distribution of the Koppers stock and the Pitt stock falls within the

meaning of section 112 (g)[1] of the Revenue Act of 1928, and further precludes the conclusion reached that application of the section mentioned requires that the distribution of the Koppers stock, the Pitt stock and the other assets, even though actually made in a single plan for the complete liquidation of Union, be broken up into three separate transactions for the purpose of computing the gain to the stockholders therefrom, also that the basis to the stockholders of the Union stock be prorated to the three separate transactions for purposes of such computation. To so hold is to make a gain computing or determining section out of section 112 instead of a gain recognizing section, as the statute definitely shows it was intended to be. There is nothing in that section at any place prescribing the method for the computation or determination of gain.

The realization of gain by stockholders from distributions made to them by the corporations in which stock is held is governed by section 115 of the act, entitled "DISTRIBUTIONS BY CORPORATIONS." Distributions in liquidation are specifically dealt with in subsection (c) of that section, which reads in part as follows:

(c) *Distributions in liquidation.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment *in exchange for the stock* * * *. The gain or loss to distributee resulting from such exchange shall be *determined under section 111*, but shall be *recognized only to the extent provided in section 112.* [Italics supplied.]

From the above it appears that the statute presents a complete and orderly course to be followed in determining the income tax effect of distributions in liquidation. The nature of the distribution or transaction for the purpose of determining gain or loss is to be resolved by the application of section 115 (c), *supra.* The amount of the gain or loss is to be determined or computed under the provisions of section 111, and the extent to which the gain or loss so realized and so computed is to be recognized is next determined by the application of section 112.

The Koppers stock, the Pitt stock and the other assets of Union having been distributed to the stockholders of Union in a single plan of complete liquidation, the receipt by the petitioner of his pro rata share of such assets was, under the plain wording of section 115 (c) quoted above, an exchange by him of his Union stock for such assets.

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

* * * * * * *

(g) *Distribution of stock on reorganization.*—If there is distributed, in pursuance of a plan of reorganization, to a shareholder in a corporation a party to the reorganization stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corporation, no gain to the distributee from the receipt of such stock or securities shall be recognized.

Following the course directed by the statute and referring next to section 111 for determination of the gain from such an exchange, we find in subsection (a) that "the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom" over the taxpayer's basis, and, further, in subsection (c) that "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Applying the above mentioned provisions of section 111 to the instant case, the gain to the petitioner from the liquidation of Union was the difference between the fair market value of the property received, namely, the Koppers stock, the Pitt stock and other assets, and the basis to him of his Union stock. Certainly there is nothing in section 111, the section that governs the "DETERMINATION OF AMOUNT OF GAIN OF LOSS", that gives any color to the claim that the gain in the case of an exchange of property is to be computed or determined separately with respect to each item of property received in the exchange, but to the contrary, the plain language of the statute is that the amount realized is the "sum" of the money "plus" the fair market value of the property and the gain is the excess of that total over the taxpayer's basis for his stock in the corporation liquidated.

The nature of the transaction having been determined by section 115 (c) and the amount of the gain computed or determined under section 111, we are next directed to section 112 to determine the extent to which the gain realized and determined is to be recognized for income tax purposes. Bearing in mind that section 115 (c) directs that distributions in complete liquidation shall for purposes of the income tax statute be treated as in exchange of the stock for the assets distributed, we find in section 112 (a) a provision that "Upon the sale or exchange of property the entire amount of the gain * * * *determined under section 111* shall be recognized, except as hereinafter provided in this section." Referring to the remaining provisions of section 112 in order, the first subsection prescribing the extent to which the gain to a stockholder from corporate distributions is recognized is 112 (b) (3), which provides:

No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

Admittedly the shares of Koppers stock and of Pitt stock were acquired by Union in corporate reorganizations and in each instance were securities of a corporation "a party to a reorganization." It is also true that the plans of reorganization contemplated the distribution of these shares by Union to its stockholders. It is thus apparent

that the only circumstance that prevents nonrecognition of all the gain realized by the petitioner from the liquidation of Union is that the exchange by him of his Union stock was not "solely" for the Koppers stock and the Pitt stock, but for other property as well.

Proceeding with the examination of section 112, we find that the exception of fact which prevents the application of section 112 (b) (3) is specifically dealt with in section 112 (c) (1) as follows:" * * * if an exchange would be within the provisions of subsection (b) * * * (3) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph [(b) (3)] to be received without recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

With section 112 (c) (1) we have a complete statutory formula for determining the effect for income tax purposes of the liquidation of Union. To summarize, the distributions in complete liquidation of Union constituted an exchange by petitioner of his Union stock for Koppers stock, Pitt stock, and other assets, and the gain is to be determined under section 111 and recognized to the extent provided by section 112. Sec. 115 (c). The gain determined under section 111 is the difference between the basis of petitioner's Union stock and the fair market value of the Koppers stock, the Pitt stock, and other assets. Sec. 111 (a) and (c). If the petitioner had received only the Koppers stock and the Pitt stock in such exchange, then none of the gain realized under section 115 (c) and determined under section 111 would have been recognized because in such case the exchange of the Union stock would have been "solely" for the stock of corporations which were parties to reorganizations and in pursuance of the plans of reorganization. Sec. 112 (b) (3). The Union stock was not exchanged "solely" for the Koppers stock and the Pitt stock, however, but for other assets as well, and as a result the gain is recognized "but in an amount not in excess of * * * the fair market value of such other property." Sec. 112 (c) (1).

There is no question that the gain realized was in excess of the fair market value of the property received other than the Koppers and Pitt stock and, applying section 112 (c) (1), the gain recognized as distinguished from gain realized or determined is limited to the fair market value of the other property. It is at once apparent that no part of the value received by the petitioner in liquidation of Union in the form of Koppers or Pitt stock is recognized for income tax purposes, the gain realized being limited to the fair market value of other property.

As authority for the application of section 112 (g) to the distribution of the Koppers stock and the Pitt stock to the stockholders of Union, the majority opinion relies upon the former decisions of the Board in *Rudolph Boehringer*, 29 B. T. A. 8, and *North American Utility Securities Corporation*, 36 B. T. A. 320. The reasoning is, first, that the Koppers stock and the Pitt stock having been distributed to the stockholders of Union without simultaneous physical surrender of their Union stock certificates, there was no actual exchange of Union stock for Koppers and Pitt stock and that an exchange is a prerequisite to the application of sections 112 (b) (3) and 112 (c) (1) and, second, that the distribution of the Koppers stock and the Pitt stock, even though made in complete liquidation of Union, having been made without actual and simultaneous physical surrender of Union stock certificates, the distribution of the said Koppers stock and the Pitt stock literally falls within the language of section 112 (g). It is then concluded that the application of section 112 (g) requires that the distribution of the Koppers stock, the Pitt stock, and other assets, even though actually made in a single plan for the complete liquidation of Union, be broken up into three separate transactions for the purpose of computing the gain to the stockholders therefrom, and in making the computation that the basis of their Union stock must be prorated to the three transactions. The inference is that to hold otherwise would result in the recognition of gain on the distribution of the Koppers stock and the Pitt stock which admittedly were in each instance securities of a corporation a party to a reorganization and were distributed in pursuance of these plans of reorganization.

Considering first the proration of the basis of the Union stock, it has been pointed out above that the application of section 112 (c) (1) and the computation of the gain from the liquidation of Union as a unit does not result in recognition of any part of the gain received in the form of Koppers or Pitt stock for under the provisions of that section the gain recognized is limited to the fair market value of the other property distributed, and no part of the value attributable to the Koppers stock or Pitt stock is included. It is thus apparent that the nonrecognition of gain on the distribution of the Koppers stock and Pitt stock under the circumstances herein is not dependent upon the application of section 112 (g). It is further apparent that the result reached in the majority opinion is not a matter of recognition or nonrecognition of gain, but a matter of computation which is governed by section 111 and not by section 112 (g) or any other provision of section 112.

The most obvious fallacy in the majority opinion however is in the conclusion that the distribution of the Koppers stock and Pitt

stock was not in exchange for the Union stock, within the meaning of section 112 (b) (3) and section 112 (c) (1), but was a distribution of those stocks without the surrender of the Union stock within the provisions of section 112 (g). This conclusion entirely ignores and completely writes out of the statute the provision quoted above from section 115 (c) to the effect that distributions "in complete liquidation of a corporation shall be treated as in full payment *in exchange for the stock.*" Congress, by the provision referred to, has completely removed any doubt as to the treatment of distributions in complete liquidation with respect to the stock of the corporation so liquidated. By that provision Congress has plainly said that a corporation and its stockholders may not defeat the exchange provisions of the statute by a mere failure at the time of liquidation to surrender the certificates which after all are only evidence of the shares in a corporation. Furthermore it should be pointed out that no contention is made that the Union stock was not physically surrendered as soon as the distribution in liquidation was concluded.

The failure to apply section 115 (c) to a distribution made by a corporation, pursuant to a plan of reorganization, may be due in part to an impression which seems to prevail in some quarters and which unfortunately may be inferred from language used in some of the decisions, to the effect that section 115 (c) and section 112 are each exclusive of each other in their application. From the plain language of section 115 (c) previously quoted, it is at once apparent that the language there used is applicable to all corporate distributions in liquidation and includes the distributions falling within the provisions of section 112. In other words, all distributions which meet the requirements of section 112 are also within the provisions of section 115 (c), but all distributions falling within the provisions of section 115 (c) are not necessarily subject to the provisions of section 112.

The majority opinion does find authority for the conclusions reached in *Rudolph Boehringer, supra,* and *North American Utility Securities Corporation, supra.* Both cases ignore or overlook the provisions of section 115 (c), *supra,* to the effect that for the purposes of the income tax statute, distributions in complete liquidation of a corporation are to be treated as in exchange for the stock of the corporation so liquidated, and in my opinion should be overruled. When distributions in complete liquidation of corporations are treated as exchanges, the non-applicability of section 112 (g) at once becomes apparent. That section by its plain language is applicable only to cases where the stock of the corporation making the distribution is not exchanged.

Furthermore, I am of the opinion that the only reasonable interpretation of section 112 (g) is that it was intended to apply to situations where the corporation making the distribution was to be continued as the owner of some property and the stock of such corporation would thereby have some value and that it was not to be applied in cases where a complete liquidation was made and the corporation, even though not formally dissolved, had no assets and its stock, even though not surrendered, had no value behind it. There is no language in the statute which prescribes a split-up of the basis of the old stock between the stock received in complete liquidation without recognition of gain and other assets received in the same plan of liquidation for the purpose of computing the gain from the liquidation, even though it be said that section 112 (g) does apply. The only statutory provision from which it might even be inferred that such a split-up of the basis of the old stock is intended, is found in section 113 (a) (9).[2] That section prescribes the basis the stock received in a section 112 (g) distribution is to have for the purpose of determining gain or loss from its subsequent sale or disposition. For that purpose the stock so received does take an allotted portion of the basis of the old stock, while the remaining portion of the old basis is left to the old stock for the purpose of determining the gain or loss in the event of its subsequent sale or disposition. Under the circumstances of a complete liquidation, however, the old stock, even though outstanding, would have no value upon which any portion of the original basis could be prorated to it. Consequently the entire basis of the old stock would necessarily be applied against the fair market value of all the property distributed in liquidation and none of it would be left to the old stock and we would still find no justification for a computation of the gain herein in the manner contended for by the petitioner and approved by the opinion of the majority.

*Gross* v. *Commissioner*, 88 Fed. (2d) 567, is cited in the majority opinion as being clearly in point and the facts therein are given in considerable detail to show its applicability to this issue in the instant case. The distinction between the two cases in my opinion is readily apparent. In this case we have found that complete liquidation and distribution of all of the assets of the Union Construction

---

[2] SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

\* \* \* \* \* \*

(9) TAX-FREE DISTRIBUTIONS.—If the property consists of stock or securities distributed after December 31, 1923, to a taxpayer in connection with a transaction described in section 112 (g), the basis in the case of the stock in respect of which the distribution was made shall be apportioned, under rules and regulations prescribed by the Commissioner with the approval of the Secretary, between such stock and the stock or securities distributed.

Co. was determined and carried out as a part of a single plan of complete liquidation. Union conducted no business and was not intended to conduct any business. It was organized to hold certain assets for the purpose of giving the appearance of a class A reorganization to the transfer by McClintic-Marshall of its remaining assets to Bethlehem and when that purpose was served Union was dissolved. In the *Gross* case the facts show that the stockholders of the Tampa Box Co., which was a business corporation and had been actively engaged in the conduct of business, determined that the corporation be not immediately dissolved but that it should continue to hold a substantial portion of its assets until such time as the board of directors should deem it advisable to make a distribution of those assets and such time as the stockholders themselves might determine upon the legal dissolution of the corporation. Furthermore the facts show that the distribution of a substantial portion of those assets was not determined upon and the legal dissolution of the corporation was not ordered for at least a year. It is further significant to note that that corporation, even though not actively engaged in the conduct of business during the year preceding its formal dissolution, was by remaining alive serving a business purpose—the preservation of its name was of value and of importance in the particular trade in which the corporation had been engaged—and, further, when legal dissolution was finally determined upon more than a year later, particular care was taken to see that a new corporation was organized for the purpose of acquiring and preserving the valuable name of the old corporation. The distinction between that case and the instant case is substantial and apparent. In that case there was no complete liquidation or dissolution and no complete liquidation or dissolution was intended. The stock of the Tampa Box Co. was not surrendered, but retained by the stockholders for a definite purpose, that of keeping the corporation alive in order that it might continue to hold a substantial amount of assets, also for the purpose of preserving a name valuable in the trade in which the corporation had been engaged. Thus in the *Gross* case we have distributions made under circumstances which literally and actually bring it within the provisions of section 112 (g). We have no such circumstances present in the instant case.

For the reasons stated above, I am unable to agree with the conclusions reached in the majority opinion of this issue and respectfully express my dissent.

MELLOTT, ARNOLD, HILL, DISNEY, HARRON, and KERN agree with the concurring and dissenting opinion of TURNER.