Joe H. Bartling v. Commissioner.
Joe H. Bartling v. Commissioner
Docket Nos. 18905, 19886.
United States Tax Court
1950 Tax Ct. Memo LEXIS 182; 9 T.C.M. (CCH) 458; T.C.M. (RIA) 50145; June 6, 1950
Willard L. Phillips, Esq., Commercial Bldg., Kansas City, Kan., for the petitioner. Elmer L. Corbin, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings duly consolidated involve income tax for the calendar years 1944 and 1945. Deficiencies were determined in the respective amounts of $1,284.80 with $601.75 fraud penalty for 1944, and $1,230.66 with $615.33 fraud penalty and 25 per cent penalty of $141.21 for 1945. The questions presented are as to deductibility of alleged business expenses, and applicability of the 50 per cent fraud penalty and 25 per cent penalty, under Sections 293 and 291 of the Internal Revenue Code. We make the following Findings of Fact The petitioner filed his income tax return for 1944 with the *183 collector at Richmond, Virginia, and for 1945 at Kansas City, Missouri. The return for 1945 was filed December 5, 1946. Petitioner, now a resident of Lee Summit, Missouri, lived throughout 1944 and 1945 in Arlington, Virginia. He was married at that time and had one child. His wife and child lived in Arlington. The petitioner was employed on March 2, 1942, by Transcontinental & Western Airlines, Inc. (hereinafter sometimes referred to as TWA), after completion of a Government sponsored pilots' training course. He was at first employed as second officer of the Intercontinental Division. During the years 1944 and 1945 he was required while on duty to wear the army uniform with the Air Transport Command Insignia upon it. The uniform was purchased from his own funds. The main routes of the Intercontinental Division were from Washington, D.C., to Prestwick, Scotland, with bases at Stephensville, Newfoundland, Gander, Newfoundland, and Reykjavik, Iceland or Mecks Field, Iceland; also through Miami, Puerto Rico, and Fortaleza, Brazil to Natal, Ascension Island, Accra, Kano, Khartoum, and Cairo. Later his work took him to Paris, Rome, Athens and through Cairo to Abadan and to Karachi, *184 India. At these bases facilities for sleeping and food were inadequate. The sleeping accommodations were usually a cot in a barracks building, without privacy from external noise and with little opportunity to get sleep. Petitioner never felt that he could get a normal night's sleep at such bases. Most of the bases in Europe and Africa were adjacent to large cities. The cost of transportation from the base to the city varied from $1 to $5 in American money. During the war the hotel situation was such that a person took what was available and paid whatever he thought he was able to pay. During the year 1944 he traveled extensively in the United States in connection with his employment, visiting Albuquerque, Dallas, Kansas City, Mobile, New Orleans, Brownsville, Indianapolis, New York, and Maine. He went to those places on navigation training flights, of which he was the captain. In the United States he often stayed in Miami and other large cities, including New York. The cost of hotel space in foreign cities was greater than those in the United States. Sometimes getting accommodations was a matter of paying the price asked for whatever could be gotten. In the foreign cities a dinner *185 cost from $3 to $5, breakfast from 50 cents to $2.50, and hotel accommodations from $5 to $14 a night. The company made a service charge of $3 regardless of whether he stayed on the base. It was necessary to register upon arrival. The $3 charge entitled petitioner to sleep in the quarters at the bases for one night. He often went into the cities for accommodations instead of staying at the quarters at the bases. He was reimbursed for his expenses by TWA at the rate of $8 per day for overseas travel and $6 per day for travel inside the continental limits of the United States. His salary in 1944 was $800 per month. He worked 12 months. The petitioner was stationed at Washington and he considered that his flights began when he left Washington and ended when he returned to Washington. Petitioner's contract for reimbursement from the company provided for payment by the quarter day, that is, that the company divide the day into sections of six hours. Petitioner kept a log book showing the day he left and the day he returned but not showing the hours. The petitioner usually left Stephensville, Newfoundland, at such a time as to arrive in Europe after dark. He estimated his expenditures and *186 did not keep accurate records. Prior to 1942 petitioner had not had sufficient income to warrant payment of Federal income tax or filing of return. He filed one in 1943 for 1942. He read the instructions on the return. He never read any part of the income tax act. Not feeling competent to make it out he got some assistance from friends in Kansas City. His return for 1943 was made out by the purser of the crew of which he was a member at the time. For 1944 and 1945 his returns were made out by one Nimro of the Maury-Henry Company, located in Washington, D.C. Nimro was recommended by petitioner's friends and the petitioner went to his office. There he saw several desks with two or three girls and some men working; also file cases and book cases filled with legal appearing books. It appeared to be a busy place. He had a conversation with Nimro about his return. Nimro told him that it was the practice of men who traveled to estimate and average their expenses, and that he, Nimro, had an understanding with the Bureau of Internal Revenue that a certain amount was the maximum that would be allowed. He took Nimro's word for it and did not know that that was not correct. The petitioner originally *187 came from Springfield, Missouri, and during 1944 and 1945 considered that place his home. Nimro told him that the difference in living costs between what he considered to be his home and where he was presently based would be an acceptable deduction. Nimro asked him several questions about the difference in living costs and stated that the differences would be computed by him and put in as a deduction. The costs of traveling to places in the United States, Nimro said, represented costs that the petitioner had for living in Washington; and the petitioner did not know that that was not proper. Nimro also told him that the expense of travel from his home in Arlington, Virginia, to the airport in Washington was allowed as a deduction; and petitioner did not know that that was not correct. The petitioner kept in his own handwriting a log book on the flights he made, from April 2, 1942, to February 1947. The entries were made usually within three or four days from a log sheet, a form furnished by the company, which sheets were turned back to the company. Log books were required by air force regulations. Counting the whole day of departure and the whole day of arrival for 1944 the petitioner *188 computed from his log book 105 days as pilot on duty; likewise for 1945 the total is 144 days, as computed by the petitioner. The records of TWA indicate a total of 92 3/4 ths days for 1944 and 127 days for 1945, and reimbursement of $715.50 and $975, respectively. The petitioner sometimes protested to the company about the difference between his log books showing calendar days and the company's records showing quarter days. When the petitioner went to see Nimro the first time he took nothing with him except the forms which the Government had sent him. Nimro told the petitioner what information he wished and the petitioner returned home and at a later date brought the information asked for so far as he had it. This included records of travel expense and cancelled checks. The major portion of the time petitioner spent with Nimro was spent by Nimro in asking questions about various items of deductions and the petitioner answered to the best of his ability. Nimro put the petitioner's answers down on a tally sheet or work sheet, added the figures up, and prepared the return from the information given to him. For the year 1944 the deadline was getting close and the petitioner was going *189 out on a trip. He left with Nimro for both years all the records and information which he took to him and never got them back. Petitioner's records were in the possession of representatives of the Commissioner of Internal Revenue later, when a public accountant representing petitioner and with power of attorney from him went to Washington to investigate them. He found Nimro's office closed. Although he saw the records they were refused him by the Commissioner's representatives and he has never been able to secure them. He told Nimro the facts to the best of his knowledge and did not tell him that he wanted to claim any particular deduction or particular item as a deduction. After talking with Nimro he presumed from the advice given him that a part of his expenses both for food and lodging while living in Washington was a proper deduction. Nimro so told him. One of the returns, either for 1944 or 1945, he signed in blank, after Nimro had taken the information and had worked out an approximation of what Nimro said was an approximation on the work sheet, and had told him what it would be approximately. Petitioner supposed that Nimro had made the return from the information supplied by *190 him, the petitioner. Petitioner did not know that the returns included items that were not deductible. In connection with travel from petitioner's home in Arlington to the National Airport, Nimro explained the matter to petitioner so that it sounded very logical to him. Nimro explained that if petitioner took a cab to the airport it would be deductible. In petitioner's income tax return for the year 1944 the only income reported is $5,834.84 [1] from Transcontinental & Western Air, Inc., gross salary being reported as $9,600. The $5,834.84 net income is arrived at by deduction of the following schedule of "Business Travel Expenses": Gross salary TWA
$9,600.00
Business travel expenses: U.S. - Albuquerque, Dallas, Kansas City, Mobile, New Orleans,
Brownsville, St. Louis, Dayton, Indianapolis, New York, Maine
R.R. - Plane fares
$ 374.12
Lodging and hotels
747.00
Meals
1,317.00
Car "C" travel 10,500 mi. at 5 cents
525.00
Foreign travel - Africa, South America, Europe, Scotland, Ber-
muda, Puerto Rico, Iceland, Greenland, Newfoundland - 92 days
at $12.00
1,104.00
Dues and taxes
67.54
Supplies
287.50
$4,422.16
Reimbursement
657.00
3,765.16
Net salary
$5,834.84
*191 The petitioner's income tax return for 1945 showed as the only income a net of $7,309.02 computed as follows: Gross salary (per contract) T.W.A.
$10,746.77
Partial travel reimbursement (per contract)h
1,016.00
$11,762.77
Expenses: U.S. travel - Memphis, Kansas City, Albuquerque, Dallas, Miami. New
York, Springfield
Hotel
$ 4.50
Meals
5.00
Cabs to and from port
2.00
Telephone
.50
Tips and miscellaneous
1.25
111 days at
$13.25
$1,470.75
Comm. ration travel 9,700 mi. at 5 cents
485.00
Uniforms
161.00
Equipment and supplies
44.00
Equipment maintenance
156.00
Dues
112.00
Long distant telephone and telegraph
120.00
Foreign Travel - Newfoundland, Prestwick, Scotland, Paris,
Iceland, Bermuda, Azores, Santa Maria, Goose Bay, Labra-
dor, Casablanca, Karachi, Cairo, Rome, Tripoli, Abadan,
Moncton, Gander, Athens - 127 days at $15.00
1,905.00
4,453.75
$ 7,309.02
The item of supplies set out in the 1944 return and "Equipment and supplies" in the return for 1945 included maps, computer, plotter, navigation kit, technical magazines, *192 and uniform equipment, all of which petitioner was required to have. The petitioner bought uniforms, and gave Nimro what receipts he had for uniforms bought. Uniforms were not worn off duty. Equipment maintenance included cleaning and laundering of uniforms, which normally, as to summer uniforms, had to be laundered once a day, when petitioner was traveling in the tropics. The items of "Dues" were for dues in Airline Pilots Association, membership in which was necessary in the same way as membership in other unions. As to 1944, the Commissioner determined the deficiency by denying deduction of $3,929.41 travel expense claimed, explained as allowance of $492.75 (82 1/8 days at $6) instead of $4,422.16 claimed. The result is a corrected net income of $9,264.25 instead of $5,834.84 reported. Fifty per cent penalty is added. As to 1945, expenses of $4,453.75, the total amount claimed, were disallowed but expenses of $762 were allowed, explained only as "Allowance is made for expenses to the extent of actual expense reimbursement from your employer." The result is a net income adjustment of $10,500.77. The 50 per cent and 25 per cent penalties were added. Opinion The petitioner *193 agrees on brief that he has failed to establish that the expenses of travel in the United States are proper deductions; by this we understand him to mean that no argument is being made with reference to the expenses denominated "Business Travel Expense" or "Expenses: U.S. Travel" as stated on the returns, representing under the evidence what was considered expense of living away from Springfield, Missouri, or "home," at Washington. He makes the same concessions as to the automobile expense, that is, the expense of personal automobile travel, to and from his residence to the airport. This leaves for consideration the expenses of foreign travel, plus expenses for supplies and equipment, including uniforms, and some other incidental expenses. The principal question is whether the fraud penalty should be imposed. We will first consider the matter of expenses on flight trips. For 1944 petitioner's log book showed 105 days, 92 of which were basis of deduction, at $12 a day, while the TWA records showed 92 3/4 days. For 1945 petitioner's log book showed 144 days, for 127 of which deduction was claimed at $15 a day; as against 127 days shown by the TWA records. The difference between the *194 petitioner's records and those of TWA is due in part to error and in part to the fact that the petitioner computed as an entire day both day of departure and day of return, whereas the company computed by quarter days. There is some other discrepancy. With reference to cost of travel, the company reimbursed at the rate of $6 for domestic and $8 for foreign travel. Under the evidence it is clear that the expense for foreign travel was much greater. [2] We find on all of the evidence that such expense was $10 a day for 1944 and $12 a day for 1945, for 92 days in 1944 and 127 days in 1945. From the amounts thus computed should be deducted as to 1944 the $715.50 reimbursement received from TWA, also the amounts allowed by the Commissioner, that is, $492.75. For 1945 the petitioner included in reported income $1,016 as partial travel reimbursement, so that only the amount allowed by the Commissioner should reduce the above allowance. With reference to items for supplies and uniform equipment the evidence is in no definite or satisfactory condition, but the items claimed were, under the testimony, placed in the returns after production of receipts; and uniforms, worn only on duty, and other *195 equipment, were not supplied by the company. Applying the doctrine of Cohan v. Commissioner, 39 Fed. (2d) 540, we approve, for 1944, deduction of $150 for "supplies" and $35 for dues, to an organization of the nature of a union. No proof as to taxes was made. For 1945, we approve deduction of $250 for uniforms, equipment and supplies and maintenance and $35 for dues. No proof was made as to telephone and telegraph items, claimed as to 1945. We next consider the application of the 50 per cent penalty for fraud under section 293(b) of the Internal Revenue Code. The burden is upon the respondent; and fraud is not to be presumed but proof thereof should be clear, cogent and convincing. A. W. Mellon, 36 B.T.A. 977. Is any part of the deficiency here "due to fraud with intent to evade tax" within the text of the statute? We think not. The situation is essentially the same as in Charles C. Rice, 14 T.C. - No. 61 (promulgated March 30, 1950), another case involving *196 a return by a pilot for TWA engaged in the same work as petitioner, and like him employing the same person to prepare the return; except that this case is devoid of evidence as to any unfavorable record on the part of the person preparing the return. We held that the fraud penalty should not be imposed. We held the same here. To do otherwise would be to impute to the petitioner fraud because, relying upon the advice of one who appeared to be and so far as this record shows was a qualified tax consultant, and on whom petitioner relied, he filed a return claiming as expenses those incurred away from "home," which he claimed as Springfield, Missouri, while he was stationed at Washington. To ascribe fraud to the claim would be to neglect the fact that what were proper expenses away from home was long a much litigated question. Though on the return the matter was styled "Business Travel Expenses" with places named, petitioner did travel extensively in the United States in connection with his employment and he was told by Nimro that such expenses represented cost of living at Washington. Though it has been held that a petitioner can not shift to a representative the burden of preparing a *197 proper return, it does not follow that the burden of proof of fraud was not by the respondent in this case. We conclude and hold that it has not been shown that the deficiency was in any part due to fraud with intent to evade tax. The 25 per cent penalty for failure to file timely return was imposed for 1945 under section 291, Internal Revenue Code. The only evidence is the fact that the return was filed December 5, 1946. Therefore, we find no error in the addition of the 25 per cent penalty. It was stipulated at trial that medical expense deductions would be adjusted under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. He does not for 1944 report the reimbursement, $715.50, as income.↩
2. We can not accept petitioner's higher figures based on high costs at European hotels, as a per diem, for obviously much of the total time was spent in flying, not at hotels.↩